SMITH *et al.*, Appellants, v. ST. LOUIS PUBLIC SCHOOLS *et al.*, Respondents.

1. The principle upon which the right to alluvion is placed by the civil law—which is essentially the same in this respect as the Spanish and French law, and also the English common law—is, that he who bears the burdens of an acquisition is entitled to its incidental advantages; consequently, that the proprietor of a field bounded by a river, being exposed to the danger of loss from its floods, is entitled to the increment which from the same cause may be annexed to it. This rule is inapplicable to what are termed limited fields, *agri limitati;* that is, such as have a definite fixed boundary other than the river, such as the streets of a town or city.

2. A lot in a town or village may be entitled to riparian privileges if bounded on a river; yet if, as originally granted, it were bounded or limited on all sides by streets, the owner thereof would not become a riparian proprietor and entitled to alluvion by reason of the fact that the original concession or grant, besides the street, also called for the river in front.

3. In the year 1766, the French commandant at the post of St. Louis granted and conceded to Pierre François DeVolsey a lot of ground in said village, of two hundred and forty feet front on the side of the Mississippi and fronting thereto (du côté du Mississipi et y faisant face), by three hundred feet in depth on the side of the woods (du côté du bois), having said front upon the grand (or main) street (tenant la dite face et par devant la grande rue,) in the rear another main street (une autre grande rue), &c. The concession was bounded on the sides also by streets. *Held,* that the concession did not constitute the grantee a riparian proprietor; that the concession was bounded by the street in front and not by the river; that neither he nor his grantees would be entitled to alluvion formed in front of the street.

*Appeal from St. Louis Land Court.*

This was an action brought to recover possession of the north half of block No. 854 in the city of St. Louis. The defendants are the Board of President and Directors of the St. Louis Public Schools and the tenants under said board. Said block is bounded as follows : west by Main street, north by Cedar street, east by Front street, or the levee, and south by Mulberry street. In support of their title the plaintiffs adduced the following evidence :

1st. A certificate of confirmation issued by Recorder Hunt under the act of Congress of May 26, 1824. This was issued in the name of Auguste Chouteau, and the land confirmed was described as " bounded on the east by Front street or the Mississippi, leaving a road between it and the lost, west by Church street, south by south I street, and north by south H street." South H street is now known as Cedar street, south 1 street as Mulberry street. The plaintiffs offered in connection with this certificate Hunt's minutes of testimony, but the court excluded them on the objection of defendants. These minutes were, however, afterwards introduced by defendants.

2d. A concession made to DeVolsey in 1766. This concession is as follows : " Aujourd'hui, 15 Août, 1766, sur la demande de M. Pierre François DeVolsey, officier dans les troupes de la marine, qui désire s'etablir au poste St. Louis, nous lui avons concedé et concédons, à titre de pleine propriété, un terrain ou emplacement pour se batir et y faire tous autres bâtimens de commodité, de 240 pieds de large du côté du Mississipi et y faisant face, sur 300 pieds de profondeur du côté du bois, tenant la dite face et par devant la grande rue, par derrière sur ln profondeur à une autre grande rue, d'un côté à une autre grande rue de traverse venant du Mississipi, qui limite ces terrains des Sieurs Blondeau et Lami, et de l'autre côté du nord à une autre rue de traverse venant du Mississipi, pour en jouir par le dit Sieur DeVolsey ou ses ayant cause en pleine propriété, sans pré-

judice au charges publiques et autres qu'il plaira à sa majesté d'y imposer, defendant à qui que ce soit de le troubler dans sa concession à peine de désobeissance. Fait à St. Louis dit jour et an. [Signed] St. Ange. Labuxiere."

The above concession was accompanied by the following translation: " This day, 15th August, 1766, upon the request of Mr. Pierre François DeVolsey, officer in the marine corps, who desires to settle at the post of St. Louis, we have granted and do grant him in full title a lot or dwelling place, where to make other buildings necessary, of 240 feet in front toward (côté) the Mississippi, and fronting thereto, by 300 feet in depth toward (du côté) the woods, bounding the said front upon the grand (or main) street, on the rear by its depth another main street, on one side another cross street running to the Mississippi which bounds the lots of Messrs. Blondeau and Lami, and on the other side to the north another cross street running to the Mississippi, to be enjoyed by the said DeVolsey and his assigns in full property, without prejudice to the public charges and others which it may please his majesty to impose, forbidding whom it may concern to interfere with this concession. Done at St. Louis the said day and year. [Signed] St. Ange. Labuxiere."

3d. Documentary evidence showing that said block was confirmed to DeVolsey's representatives by the act of Congress of April 29, 1816.

4th. Plaintiffs introduced evidence showing title in themselves under Auguste Chouteau to the north half of said block embraced in said concession to DeVolsey; also showing the situation and boundaries of said concession as possessed and occupied by Auguste Chouteau for many years. It was bounded on the south by Mulberry street, on the west by Second or Church street, and on the north by Cedar street. The land in controversy lies immediately east of the north half of the block No. 42 embraced in said concession and upon the eastern side of Main street. The plaintiffs introduced evidence to show that until a recent period the Mississippi river ran as far west as Main street; that the

western bank of the river intersected said block No. 42; that in the year 1814, a snag lodging in the river, a bar commenced forming in the river opposite the city, which gradually became an island; that there was a slough west of this bar through which boats passed at high stages of water, the banks of said slough lying west of Main street and of the land in controversy; that the great floods of 1844 and 1851 caused the filling up of said slough; that previous to the year 1851, said Main street did not run as far south as said block 42, but that said street is now situated where the river formerly ran; that previous to the extension by the city of St. Louis of Main street in front of said block 42, there was a path there passable for men and horses only and not wagons; that this path was along the bank, and previous to the introduction of steamboats was used as a tow-path.

The defendants introduced evidence showing that on the 9th of November, 1809, the town of St. Louis was incorporated; that its boundaries included the land in controversy; that on the 9th of June, 1810, the board of commissioners confirmed a lot of 240 feet by 300 feet, embraced in the DeVolsey concession, to Auguste Chouteau, as DeVolsey's representative, and ordered " that the same be surveyed conformably to the possession;" that on the 13th of December, 1811, the commissioners issued their certificate in said Chouteau's favor; the same was recommended for confirmation by Recorder Bates, and confirmed by act of April 29, 1816, to DeVolsey's representatives, 240 feet by 300 feet, to be surveyed; that Recorder Hunt issued his certificate of confirmation to Auguste Chouteau for said block of 240 feet by 300, bounding it as above set forth. The defendants also introduced United States survey No. 173 of St. Louis lands. This was a survey made in 1835 of the three confirmations above set forth of the DeVolsey concession. By this survey the concession and confirmation were limited to block No. 42, and bounded east on First or Main street, and west on Second street. This survey was approved in 1850. The defendants also introduced in evidence, against the objection

of plaintiffs, a plat of St. Louis known as Chouteau's plat. This was not an official survey, but was admitted as evidence against plaintiffs claiming under Chouteau. The defendants also showed an assignment and designation of the land in controversy for the use of schools. This assignment and survey embraced the whole block immediately east of block 42; it embraced the land in controversy; it was made in 1844.

The court, on motion of defendants, gave the following instruction to the jury: " Under the evidence offered by the parties respectively, the plaintiffs are not entitled to recover, and the jury is therefore instructed to find for the defendants."

The plaintiffs asked and the court refused the following instructions: " 1. If the jury believe from the testimony that before the 20th of December, 1803, Auguste Chouteau and those under whom he claimed had inhabited, cultivated or possessed block 42 in the town of St. Louis, claiming the front on the Mississippi river, and that he conveyed the north half of said block, bounding it east by said river, to his daughter Emilie Smith, and that the plaintiffs are the children and only heirs of said Emilie Smith, and that the land sued for has been formed by accretion from the deposits of the river added to said north half of said block 42 since the year 1844, then the plaintiffs, as owners of the shore, are entitled to such accretions as riparian owners, and the jury will find for the plaintiffs. 2. If there never was in actual fact any street in front of said block 42 laid out and used prior to 1851, actually existing and known as Main street, then the call for a street, road or tow will not deprive the plaintiffs of their river front, with its claim to the alluvial deposits and accretions from the river. 3. Notwithstanding a street known as Main street may have ran between said block No. 42 and the water's edge, the existence of said street would not have deprived the plaintiffs and those under whom they claim of the right to the accretions made by the river in front of the street and said block."

*Whittelsey*, for appellants.

I. The court erred in refusing to admit Hunt's minutes. Although not testimony to show title, yet there was good evidence to show the claim. So also the court erred in refusing to admit DeWard's copy of Paul's map, the original being lost, and it being shown to be a correct plat of an official survey of the city showing the locations of streets and lots. (New Orleans v. United States, 10 Pet. 662, 712.) What is called Chouteau's plat was not admissible in evidence. It was not based upon actual survey, not official, not correct.

II. The plaintiffs are riparian proprietors, and entitled to alluvion. The claim presented was for a lot bounded east by Front street or the Mississippi, leaving a road between it and the lot, and for this lot a certificate was issued. Front street and Main street are not different names for the same street, but Front street is what is now known as the levee, and lies in front of the lot sued for. It is evident from the testimony that Chouteau claimed a river front, while he admitted the subjection of the land to the public servitudes, tow-path, rights of navigation, &c. (4 Mo. 343 ; 3 Scam. 510.) The most notorious object called for as a boundary should control. (4 Kent, Com. 466 ; 11 Conn. 60 ; Municipality No. 2 v. Cotton Press, 18 La. 123.) The lot had a river front under the French and Spanish governments, with a right to alluvion. (6 Martin, 19 ; 10 Pet. 662.) The confirmation conferred the Spanish title as it then existed. (27 Mo. 89.) The concession fronted on the river. (24 Wend. 451 ; 11 N. H. 531 ; 18 How. 157 ; 1 Gill & Jo. 249 ; 8 Gilm. 548 ; 2 Wis. 308.) No survey could take away this right. The grants of St. Ange and Labuxiere were always recognized by the Spanish authorities. A boundary by a river passes a riparious estate, and in rivers not navigable at common law the title passes to the centre of the stream. (3 Kent, Com. 429 ; 7 Mass. 496 ; 14 Mass. 149 ; 6 Cow. 544 ; 5 Wend. 423 ; 19 Pick. 191 ; 5 Wheat. 374 ; 3 Ohio, 495 ; 5 H. & Jo. 195 ; 3 Sm. & M. 366 ; 13 How. 381.)

III. The plaintiffs' grant, claim and confirmation of a river boundary must pass the right to go at least to low water-mark and to follow the receding shore. They are owners of the shore, and as such own the shore. (10 Pet. 662; 1 Gill & Jo. 249; 5 Wheat. 380; 3 S. & M. 366, 6 Mar. 19; 11 Ohio, 138; 3 Ohio, 496; 8 Port. 9; 3 Scam. 510 Code; Civile, § 556, 557, 561; 8 Pothier, 179, § 157; 1 Mor. & Carl. Part. 346; Inst. 2, 15; Dig. 43, 12, 11; 18 How. 150, 157; Coop. Just. Inst. 68; Dig. 41, 38; Ventr. 188; Schulz Aq. R. 137; 7 Bing. 163; 3 B. & C. 90; 5 B. & Ald. 268; 10 Price, 350; 3 T. R. 253; 4 B. & C. 598; 5 Eng. L. & Eq. R. 258; 8 Am. L. Rep. 219; 4 La. Ann. 30; 5 id. 36; 8 Rob. 211; 18 Louis. 122, 280.) By the common law the waters and soil under the waters of rivers above the flow of the tide were private property. In the United States this rule applies. If the waters are capable of navigation for vessels, they are public highways. (31 Maine, 9; 8 Barb. 239; 2 Swan, 9; 3 Zabr. 624; 1 Penn. 105; 14 B. Monr. 367; 3 Mich. 519; 19 Pick. 191; 7 Conn. 186; 20 Wend. 111; 22 id. 425; 1 Whart. 124; 2 id. 108; 9 Serg. & R. 26; 1 Yeats, 16; 28 Penn. 206; 26 Penn. 51; 6 Hump. 367; 18 Georg. 539; 13 How. 381; 6 Georg. 139; 2 Port. 436; 8 Port. 9; 2 Ohio, 307; 2 McLean, 376; 3 Ohio, 495; 1 Hawks, 56; 8 La. Ann. 219.) The Mississippi river is now navigable, so far as the rights of riparian owners are concerned. (See 1 Land Laws, 23, 54, 56, 107, 98, 185, 187, 195, 202, 216, 286, 310; 3 How. 212; 9 How. 471; 1 R. C. 1855, p. 50, 81; 8 Porter, 9; 9 How. 471; 16 Mo. 124; 8 Gill. 548; 1 Partidas, 33; 1 Terr. Laws, p. 948; R. C. 1825, p. 587; R. C. 1835, p. 406; R. C. 1845, p. 744; R. C. 1855, p. 1081; 4 Mo. 467; 6 Mo. 225; 7 Mo. 307; 24 Mo. 273.) See statutes relating to towns and cities, showing that the banks of rivers are private property. (1 Terr. Laws, 184, R. C. 1825, p. 764; 1835, p. 600; Sess. Acts, 1839, p. 159; Sess. Acts, 1841, p. 132; Sess. Acts, 1843, p. p. 16, 117.) See ordinances of St. Louis, Nos. 1135, 1146, 1673, 1751, 1752, 2263, 2359, 2582, 2596, 2751, 2967. The

statutes of Missouri show that this state has adopted the rule that rivers navigable in fact are common highways, subject to public uses, but that the riparian owner has property in the banks and even the beds of the watercourses. The question of state sovereignty has, however, nothing to do with this case, for the alluvion belongs to the riparian owner in any case. The grants were made before Missouri became a state. (3 How. 212; 9 How. 478.)

IV. The reservation of a road or tow in front of the lot did not prevent the grant and confirmation from passing a riparian right and the claim to accretion and alluvion. (Morgan v. Livingston, 6 Mart. 19; 8 Part. 9; 18 Louis. 213.)

V. Under the French and Spanish governments New Orleans was the only city that had an existence as such by legal authority, and out of that city all estates and grants were rural. (6 Mart. 19; 10 Pet. 662; 5 Louis. 423; 18 Louis. 213.) There is no evidence of any official survey of St. Louis prior to the survey made under the authority of the city in 1823. Many of the Spanish grants of lots in St. Louis called for the river as a boundary. These embraced nearly the whole front of the town. The grants were rural; the town was not laid out with any quay or road in front. The grants were intended to pass river fronts. Urban property, however, is entitled to alluvion, if the proprietors are riparian.

VI. The incorporation of St. Louis in 1809, and the fact that this lot was within the limits of the town thus incorporated, can not take away the right to alluvion. In fact there was no street in front of this lot laid out by the authorities of the town. (10 Pet. 662; 6 Mart. 19; 4 How. 430.) There was no street in use at the time of the survey in 1835; the street was merely a nominal call. The survey could not take away the right to accretion that might afterwards be made. (18 How. 150.) No patent certificate has issued on the survey. The plaintiffs' title under acts of 1812 and 1816 is good. (16 How. 494; 17 How. 403; 19 How. 202; 18 How. 473.) There was no land beyond the survey; the

river was in the line of the block, and the survey showed what was not to be found on the ground.

VII. The survey of school lands was void. The land was not a vacant village or out-lot under the act of June 13, 1812. It was under water until 1844; when it emerged it became alluvion.

*Casselberry,* for respondents.

I. No owner of real estate was entitled to any riparian rights within the old Spanish town of St. Louis; there was an open space between the river and the first row of lots, which belonged to the public. (2 White, Recop. 99, 1111.) If any person had possessed any lot to the edge of the river he was a violator of Spanish law, and had no lawful "right, title or claim" to be confirmed by the act of 1812. All the Spanish towns in Missouri that fronted on any river, four in number, had open spaces between the lots owned by private individuals and the river. See plats in office of surveyor general. (10 Pet. 662; 1 Hennen's Dig. 5—9; Livingston v. Hurman, 9 Mart. 656; Packwood v. Walden, 7 Mart. N. S. 88, 626; Morgan v. Livingston, 6 Mart. 325.) The title to the streets is and was in the public. (See Revised Codes, 1825, 1835, 1845, 1855, tit. Town Plats.) The plaintiffs were not riparian proprietors.

NAPTON, Judge, delivered the opinion of the court.

The facts of this case are essentially the same as in the case of Smith and others v. The City of St. Louis, 21 Mo. 36.

Upon the trial, however, in the present case, the plaintiffs confined the documentary proofs on their side to the confirmation to Auguste Chouteau under the act of Congress of 13th June, 1812—relying on parol proof of possession and inhabitation to show the extent and boundaries of the lot, without introducing the official survey of 1850—the original grant to DeVolsey, made by St. Ange in 1766, three years after the town of St. Louis was founded, and the confirmation of this grant by the act of Congress of the 29th April, 1816. The

survey of Brown, under the three confirmations—of the old board of commissioners and of the two recorders, Bates and Hunt—was introduced in evidence by the defendants.

It is not by any means clear that the introduction or omission of the survey could materially affect the question of riparian rights.   In either case, the lot is bounded on all sides by streets.   The original concession, in addition to giving a boundary on all sides by streets, makes its eastern side "*face au fleuve*" or front towards the Mississippi; and the only question not discussed or determined in the former case, is whether this expression in the original concession constitutes the lot a riparian one, taken in connection with the other descriptive words of the grant.

The DeVolsey grant was of a lot 240 feet front, on the side of or towards the Mississippi river (du côté du), and fronting thereto (et y faisant face), by 300 in depth on the side towards the woods (du côté du bois), having on its front the grand or main street (tenant la dite face et pardevant la grande rue), on its rear another great street, &c.

Confining ourselves, then, to this concession, we find that the lot conceded was bounded on the east by Main street (le grande rue), on the west by another great street, not named, and on the north and south by streets running at right angles to the streets first named.   The terms of the grant also describe the east front to face the river (y faisant face).   The question is, do the words "*faisant face au fleuve*" make this lot a riparian one, notwithstanding the particular designation of the streets on all its sides ?

The law of alluvion is understood to be a part of the *jus gentium*, that code which natural reason has established among all men.   As the Romans, more than any other ancient nation, had investigated with great care and ability the principles which natural reason dictated as the rule of action among men, and had, at all events, so far advanced beyond their predecessors in civilization, the Greeks, as to reduce these principles to a code, it is to the civil law, and the codes of modern Europe based upon it, that we must resort to

ascertain the true extent and limits of this doctrine of alluvion. It will be found, indeed, that upon this subject the Roman law, and the French and Spanish law which sprung from it, are essentially alike, if we except mere provincial modifications; and it is believed that the English common law does not materially vary from them. This uniformity necessarily results from the fact that the foundation of the doctrine is laid in natural equity. That which common sense or natural reason has established among enlightened people must be essentially the same everywhere, and as all the various codes are drawn from this common source, their main features must be also the same.

The plain and simple principle upon which the right of alluvion is placed in the civil law is, that he who bears the incidental burdens of an acquisition is entitled to its incidental advantages; consequently that the proprietor of a field bounded by a river, being exposed to the danger of loss from its floods, is entitled to the increment which from the same cause may be gradually annexed to it. This rule, however, did not apply to fields which the Romans termed limited, or *agri limitati*. "In agris limitatis jus alluvionis locum non habere constat."

The difficulty has been to determine the true meaning of this exception. So far as the question has arisen frequently in Louisiana, in reference to Spanish grants, and so far as the question in this case is concerned, the point has been there, and arises again here, whether a lot in a town surrounded by streets is properly riparian, or is *ager limitatus*, and therefore not entitled to riparian rights. We have also to consider the further question, whether the description in DeVolsey's grant, and the use of the words " face au fleuve," qualify or limit or destroy the effect of the particular designation of the limits by streets.

There was undoubtedly a distinction in Lower Louisiana between the Spanish grants of rural lands lying on the Mississippi, and the lots laid out in the city of New Orleans as authoritatively established by the Mississippi Company. In

all grants of lands on the river, there was a reservation, implied or express, of a road or highway on the river bank. This grew out of a peculiarity in the physical conformation of the country, where dykes or levees were essential to the protection of the river low grounds from inundation, and where custom or law had located the public road on the river bank, either adjoining to or on the levee. There is no doubt that, according to well settled and perfectly harmonious decisions of the courts in Louisiana, a grant of rural lands with a river front, or by the unqualified expression " face au fleuve," would take the proprietor to the river, notwithstanding this easement of a road on the levee, or adjoining, to which the public were held entitled. The intervention of the road in such cases does not prevent the right of alluvion. The grant is considered a riparian one, and attended with all the incidents of such grants. It has been equally well established that the lots in the original city of New Orleans, as authoritatively laid out by the Mississippi Company, adjoining the river, are not entitled to alluvion. We do not, however, from this circumstance, infer that there was an essential distinction between urban and rural property, based *solely* on this single peculiarity. The decisions in Louisiana are not understood to declare that urban property may not have riparian rights; that a town proprietor, whether sovereign or a private individual, may not so lay off lots in a town or city as to be strictly riparian and entitled to the benefit of alluvion. No reason is perceived why this riparian privilege should be confined to lots of a particular size or in a particular locality. These are not the circumstances which seem to us to determine the question. If the river is the boundary of a town lot, it may be riparian just as much as a tract of land would be in the country. But the question is, whether a lot of ground, which is bounded or limited by streets, can with any propriety be said to be bounded by a river. Is it not *ager limitatus*, within the definition of that term as understood by the civilians?

In the French Encyclopedia—a work of high authority,

20—VOL. XXX.

from the great reputation of its principal contributors, and quoted in the discussions on this subject which the celebrated Batture controversy elicited—we find the following exposition of this doctrine: "We must observe, however, that to acquire by right of alluvion, two conditions are necessary: first, that the increase should be made slowly and imperceptibly, in such a manner that it can not be discovered in what time each part of the alluvion has been formed to and consolidated with the inheritance; second, that the inheritance, by virtue of which the right of acquiring by alluvion is claimed, be contiguous to the river, in such a manner that the bed on which it flows seems, as it were, to be a part of the same inheritance; for in case it did not bound exactly to the river, and that it was bounded by a causeway, or by a road, the parts left uncovered by the river between its bed and the road can not belong to the proprietor of the inheritance situated on the other side of the road. Those lands belong to the king in navigable rivers, and to the feudal lords in those that are not so." (2 Hall, L. J. 327.) It will be remarked that this position does not conflict with the doctrine of the Louisiana courts, which held the Spanish grants upon the Mississippi to be riparian, notwithstanding the intervention of a road or highway between them and the river. These grants were *bounded* by the river and not by the road. Their extent and boundaries on the side adjoining the river shifted with the windings of the stream, and the road was liable to the same fluctuations. Whether the road was regarded as absolutely vested in the public, or what would be termed at common law a mere easement, did not vary the force of this circumstance. It was a road which had to be left open on the land granted, and the burden of its repair, and of furnishing a new road further back in the event of the original road being carried off into the river, devolved on the proprietor of the grant. It is not, then, the *existence* of a road or causeway which deprives the owner of alluvion, but it is the fact that the road or causeway is the *boundary* of the land.

This opinion in the Encyclopedia seems to be confirmed by what we find in those eminent publicists, Vattel, Puffendorff and Wolff, and referred to by Mr. Duconceau in his opinion on the Batture case. (4 Hall, L. J. 549.) Vattel says, (book 1, p. 207,) "The river belongs to the public in whatever part of the country it flows; but the bed being abandoned, half of it is added on each side to the contiguous land, if they are *arcifinies*, that is, having *a natural boundary with the right of alluvion.*" Wolff says, (part 2, ch. 3, sec. 252,) "Landed estates are of three kinds: 1st. Those that are not limited by any precise bounds, but are only described by the quantity which they contain. 2d. Those which have fixed artificial limits—that is to say, boundaries made by the hand of man. 3. Those which we call *arcifinies*—that is to say, which have natural boundaries, such as rivers, mountains or woods. He who has wished that his estate should be *arcifinie* is considered as having acquired the right to take possession of alluvions; therefore the right of alluvion belongs to those whose estates are *arcifinies*, and not to others. Consequently, as an estate is not said to be *arcifinie* if there be between it and the river a public road, *not due by the estate and a part thereof*, the right of alluvion is not attached to the property of the estate." Puffendorff, (book 4, ch. 7, 3, 12,) says: "This right (to alluvion) is presumed to accompany any piece of land assigned to a private person, if, in assigning the bounds of it, the neighboring river is mentioned at large."

The opinions of Mr. Livingston in the various discussions, which he maintained before the public and at the bar, on this doctrine of alluvial rights, could not, taking with consideration the circumstances under which they were delivered, be regarded as authoritative; yet his eminent abilities, the great labor and research bestowed by him on the subject, and the great number of years during which these researches were conducted, render his deliberate conclusions, asserted with confidence and persisted in with uniform consistency to the last, worthy of attention and respect. Upon the point now

under consideration Mr. Livingston, from the beginning of his controversy with Mr. Jefferson, in 1807, down to his argument before the Supreme Court of the United States in 1836, in the case of New Orleans v. The United States, uniformly maintained that " wherever such a boundary line as a street existed between the land and the river, the proprietor of the lot could not claim the alluvion, for the plain reason that he was not the proprietor to the water's edge, and that therefore what was added by the water was not added to his land, but to the land which lay between his front boundary and the river." (5 Hall, L. J., p. 123.) In relation to the Spanish grants of lands on the Mississippi, (rural grants,) Mr. Livingston admitted, and such was indeed the ultimate decision of the court in Morgan v. Livingston, 6 Martin, ——, that " the expressions used in those grants to designate the boundaries and extent were generally, perhaps universally, so many acres front, or front to the river, (*tant d'arpens de face*, or *face au fleuve*, or *sur le fleuve*,) and these expressions, *when thus unqualified*, had, without a single exception, been considered as giving the grantee a boundary on the river." (5 Hall, L. J., p. 120.) But Mr. Livingston adds, " that in most instances in Europe, and some in America, where towns have been established on public lands, the town lots have no right of alluvion ; but the reason flows from the very principles I endeavor to establish. It is because the public is, and individuals are not, the riparian owner. All the land belonging to the sovereign, he grants lots by *metes* and *bounds ;* these become *agri limitati*, and are not entitled to alluvion." (p. 188.)

It did not become necessary to decide this point in the case of Gravier v. New Orleans, determined by the territorial superior court in 1806 ; (2 Hall, L. J., p. 441;) but it was held in that case, as in the subsequent decision by the supreme court of the state, in Morgan v. Livingston, that the Gravier tract was bounded by the river and not by the highway, and that alluvion attended the grant ; that although Gravier had sold all his front lots, yet, as the alluvion was in

existence at the date of the sale, and was not in terms granted along with the lots, and was not divested by any acts or words amounting to a dedication to the public, Gravier was still the owner of the Batture.   In the case of Morgan v. Livingston, 6 Martin, ——, Poeyfare's deed had no limit on the side of the river; it was sold simply *face au fleuve*, and not a foot of ground was retained by Gravier between Poeyfare and the river; and he, Poeyfare, was considered as the proprietor, upon whom the law imposed the burden of repairing the road and the levee and supplying the ground for another road and levee, if either was carried away by the stream. In the argument of that case, Mr. Livingston maintains the same principle he had asserted in his pamphlet reply to Mr. Jefferson : " It is admitted," he says, " that if the conveyance to Poeyfare had been of a lot in an established town, the words used in it would not bound the grantee on the water ;" and he states as a fact that all the lots in New Orleans, on Royal street, are designated in the grants as "*frente al rio*," and so in all the title deeds to the lots on Levee street, but they had been always regarded as town lots, limited by the streets, and not bounded by the river, and entitled to alluvion.   He therefore contended that the presumption, which the words "*face au fleuve*," or "*frente al rio*," ordinarily carried with them, could not prevail in a town lot, where the precise measurement was given, and the public streets formed an impediment to the passage of the lines across it, and that the lot in Gravier's addition was as much a limited lot as in the city proper established by the Mississippi Company.   The general proposition in relation to town lots was admitted by the able counsel who was on the opposite side.   " To the city," said Mr. Ellery, " belong as necessary appendages, its commons and shores; its lots are all bounded by streets, and are sold, whether so expressed or not, *according to its plan*."   (6 Martin, p. 134.)   But he contended, and successfully, that Gravier's addition and plan did not make Poeyfare's lot a town lot; that it was a trape-

zium of an irregular figure; that so far from being bounded by streets, no streets were named in it; that it was in fact so located as to shut up three streets laid out in the plan of the addition; that it was not called a lot, but a piece of ground, *un pedazo de tierra.* The opinion of the court was in accordance with these views of Mr. Ellery. Judge Martin states in his opinion that New Orleans was the only town established by legal authority, and that in it the owners of the lots nearest to the river have no part of the bank as accessory thereto. " These lots were not charged with any of the burdens attending rural riparian estates; the levee, road or street was made or kept in repair at the joint expense of the owner of every lot in the city, the furthest from the water contributing as much thereto as the nearest; no riparian duties are imposed on a lot in New Orleans, either by the law or any clause in its grant." But the judge regarded Poeyfare's purchase of the trapezium as a purchase of rural estate, burdened with riparian duties; that he had imposed upon him the duty of repairing the road and levee, and that Gravier's private survey of the land did not relieve him from this duty; and that the assent of the sovereignty alone could change this corresponding burden and benefit.

It will be seen, by reference to the subsequent opinion of this learned judge in the case of the Cotton Press, 18 Lou. 249, that the decision in Morgan v. Livingston was mainly based upon the position that Poeyfare's lot was rural property; that it was *ager arcifinious,* and not *ager limitatus;* that the assent of the Spanish government to the erection of Gravier's faubourg not having been given until the arrival of the Baron de Carondelet in Louisiana, several years after Gravier's sale to Poefare, the plaintiff's claim was to be regarded as still rural; and the opinion of Judge Martin, as explained and more fully developed in the case of the Cotton Press, is undoubtedly in conformity to the views urged by Mr. Livingston in the former case, and harmonizes with the views taken by the same judge in De Armas v. The Mayor, &c., 5

Lou. 132, and sanctioned by the Supreme Court of the United States, in New Orleans v. United States, 10 Peters, 662, and Cinnannati v. Lessee of White, 6 Pet. 432.

The doctrine of the Roman law concerning *agri limitati* is fully recognized by Judge Martin as not confined to a particular class of military grants peculiar to that empire, but as a deduction of natural reason applicable whenever the character of the grant makes it so. " All the lots in New Orleans," observes the judge, " are *agri limitati*, for, as the street runs along the river in front of them, none of them are bounded by the river, and, as the street is not at their risk and charge, they can not be injured by the action of the water thereon." Here it will be perceived that the exemption of the lots bordering on the river in New Orleans, from the privileges and burdens of riparian lots, is not placed upon the ground that the city was authoritatively established, but upon the general principle that they are *agri limitati;* that they are not in the legal sense of the term riparian ; that, not being subject to the burdens of riparian proprietors, the owners of such lots are not entitled to the alluvion.

The opinion of the majority of the court on this point, delivered by Judge Bullard, does not deny the general principle of *ager limitatus*, although its applicability to the case under consideration was denied. Judge Bullard's conclusion, after a critical examination of the text in the Roman digest, and a reference to authority of Niebuhr, is in these words: " After the most attentive consideration of this part of the case, it appears to me there is nothing in the Roman law which provided that the right of alluvion was restricted to land, or portions of land, bearing particular names, or having particular localities ; but the right depended altogether upon the question whether the tract had fixed and invariable limits, or a natural boundary on one side at least, liable to be affected by a water course, no matter whether it bore the name of *ager, prædium*, or *fundus ;* nor do I find that cities formed any exception to the general rule."

This case was determined in opposition to the opinion of

Judge Martin; but there were various circumstances, bearing upon the main question in the case, growing out of the changes in the codes of Louisiana, which recognized, or appeared to the court to recognize, the rights of individual ownership in the Batture of New Orleans, making no distinctions between it and rural estates, so that it can not be considered as conclusive upon the question we are called upon to determine in this case. The point upon which the opinion of the majority of the court turned—in coming to the conclusion that the intervention of a street between a lot in the faubourg of New Orleans and the river did not prevent the lot from being riparian, any more than the road, which was impliedly reserved to the public in rural grants, formed an obstacle to the right of alluvion in such grants—was that, in both cases, the road or street vested absolutely in the public, and therefore the proprietor might be said to go to the water's edge in one case with as much propriety as in the other. It is true that the courts in Louisiana had held that the soil of a public road belongs to the public; but, conceding this position—concerning which, however, there has been some diversity of opinion among the writers on civil law—the concession does not destroy the distinguishing characteristics of the two classes of grants. There is still an essential distinction between the road which shifts with the stream, and which does not bound the grant, and the street which is fixed and is the limit of the lot. In the one case, the proprietor of the land is bound not only to repair the road, but to furnish a new one when the old one has been washed away. In the other case, the proprietor of the lot bounded on one side by a street not only can have no kind of claim to the street or the soil in it, but he is under no more obligation to keep it in repair than any other owner of an adjacent lot or lots situated in any other part of the city. If the street is lost in the river, it can not be claimed that the proprietor of the lot is bound to furnish the public with another street over his lot. Under the power of eminent domain the public may undoubtedly require the street to be opened

over the private lot, but this can only be done by compensating the owner. The condition, therefore, of urban and rural property seems to be, in this respect, essentially different, where the city lot is bounded by a street next to the river, and its limits are not the river bank itself. In truth, the doctrine of the civil law, that the soil of the public road belongs to the public, must necessarily be understood as true only *sub modo*. It is admitted that in the case of rural grants, the road changes with the stream along whose banks it passes, and that when one road is lost by the inundations of the stream, another is still due from the proprietor to the public. The soil, then, of the second road, and of any number of successive roads, must all be vested in the public, and this seems, after all, to be a mere change of words to describe what the common law terms an easement. This it is to all essential purposes, whatever may be its name ; and yet, upon this single circumstance, the opinion of the majority of the court in the Cotton Press case, in 18 Lou. 249, is based, so far as this point is concerned, and we confess that the conclusion of Judge Martin seems to us better supported both by authority and reason.

Our conclusion is that the DeVolsey grant, being of a lot in the town of St. Louis bounded in the concession by streets, was not a riparian grant, notwithstanding the description of the lot as fronting on the river on its eastern side, as its western was described as fronting towards the woods.

We do not consider the fact that the town of St. Louis was laid out without any express authority from the king of Spain, as entitled to any weight in determining the character of the concession of lots by the Spanish commandant. Our opinion upon the proper construction of St. Ange's concession is not based upon any distinction between urban and rural property, as such, but upon the general doctrine of limited fields, applicable, as we understand it, to grants in the country as well as in the city, where the lines of enclosure are fixed and definite, and do not vary with the river on which the land may be located. It is not easy to perceive

how the circumstance that a proprietor establishes a town, with or without legal authority, can affect the construction of his grants or conveyances of lots. It might be so if the law was that lots in a town or city *ex vi termini* are deprived of alluvion, no matter how designated or bounded. But we do not so understand the law. It is not simply because a lot is in the city that it is deprived of alluvial rights, where it lies adjoining a stream; but it is because the street between the lot and the river is dedicated to the public by the proprietor, and is no part of the lot granted, because the lot is bounded by the street, and its owner is under no obligation to repair it other than that which may be imposed upon all other citizens.

The judgment of the land court is affirmed. The other judges concur.