DeLassus v. Faherty.

DeLASSUS v. FAHERTY, Appellant.

164   361
173   ³249

Division One, June 29, 1901.

1. **Accretions:** ADDITIONS TO SHORE: SIDE LINES. An accretion to shore land, formed by gradual and imperceptible action of nature and joined to the main land, belongs to the owner of the shore land. And this is true notwithstanding there must be a change made in the direction of the side lines of the land owned by the riparian owner so as to give him proportionally as much river front as he had before the accretion was formed.

2. ————: INTERVENING CREEK. The doctrine of accretions will scarcely permit the jumping of a wide creek. So, that, if the creek always separated the "made" land from the shore, it can not be said to be an accretion to the shore, that is, to be joined on to and become a part of the shore land. But if the land originally formed as an accretion to the main land and was at first a unit or whole, and then the creek, after the formation, cut a new channel through the land so formed and thus separated it into two parts, then the riparian owner's right thereto is not affected by the fact that at the time of the trial the creek runs between the land sued for and the shore.

3. ————: FINDING OF COURT SITTING AS JURY. Where there was evidence to justify the trial court in finding that the "made" land was either an accretion to the shore land or to a surveyed island in the river, the finding, being in an ejectment, is not subject to review in the appellate court.

Appeal from Perry Circuit Court.—*Hon. James D. Fox,* Judge.

AFFIRMED.

*Killian & Greenwell* for appellant.

(1)  Plaintiff must show title or right of possession in himself before he can disturb defendant's possession, and must recover, if at all, on the strength of his own title, and not on the weakness of that of defendant.   Foster v. Evans, 51 Mo. 39; West v. Bretelle, 115 Mo. 653; Siemers v. Schrader, 14 Mo. App. 346; Dunlap v. Henry, 76 Mo. 106; Parker v. Cassingham, 130 Mo. 348; Chenault v. Quisenberry (Ky.) 57 S. W. 234.   (2)  The owners of land bordering on navigable waters own only to high-water mark, and the title to the bed of the stream up to high-water mark is in the public.   Barney v. Keokuk, 94 U. S. 324; Gould on Waters, sec. 39; Snively v. Bowlby, 152 U. S. 1.   (3)  A body of land surrounded by water in its flow in an ordinary stage is an island, although at some periods of the year the water may not pass. ˙ Stover v. Jack, 60 Pa. St. 339.   (4)  In order for a riparian owner on a navigable stream to become entitled to accretions formed on the bed of such stream, they must be formed gradually and imperceptibly, and must begin at his line at highwater mark. Barney v. Keokuk, 94 U. S. 324; Gould on Waters, sec. 39; Snively v. Bowlby, 152 U. S. 1; Adams v. St. Louis, 32 Mo. 25; Benson v. Morrow, 61 Mo.˙ 345; Cooley v. Golden, 117 Mo. 33; R. S. 1899, art. 6, ch. 122; Rees v. McDaniel, 115 Mo. 145; Perkins v. Adams, 132 Mo. 131; Cox v. Arnold, 129 Mo. 337; Crandall v. Smith, 134 Mo. 633; Railroad v. Ramsey (Ark.) 13 S. W. 931; Wallace v. Driver (Ark.) 33 S. W. 641.   (5)  In all cases where a non-navigable stream becomes the boundary of a tract of land, the boundary of the land changes as the thread of such stream changes by gradual and imperceptible accretions, the law of accretions and relictions being the same as to navigable and non-navigable streams, except that in the case of non-navigable streams the thread of the stream is the boundary line, the ownership of the bed being in the adjacent owners, while in navigable streams high-water

DeLassus v. Faherty.

mark is the boundary line, the ownership of the bed being in the public. Benson v. Morrow, 61 Mo. 350; Primm v. Walker, 38 Mo. 98, 99; Gould on Waters, sec. 159.

*Edward Robb* for respondent.

(1) This court will assume that the rulings of the trial court were correct, until the contrary be made to appear; and when it tries a case like this, sitting as a jury, the appellate court will not weigh the evidence and determine whether the finding of the trial court was correct on the evidence. Minton v. Steele, 125 Mo. 190; Fahy v. Gordon, 133 Mo. 426; Bray v. Kremp, 113 Mo. 552; Rea v. Ferguson, 72 Mo. 225; In an action of ejectment, a finding of the facts has the effect of a special verdict. Freeman v. Moffit, 135 Mo. 269. The weight of the evidence is for the trial court. Hahn v. Cotton, 136 Mo. 216. · The same is true where the questions of adverse possession is raised. Brown v. Brown, 106 Mo. 611. And where there are disputed boundary lines. Grant v. Moore, 128 Mo. 43. Where there are controverted facts and the evidence is contradictory, the appellate court will consider that the facts were correctly found by the trial court. Waddell v. Williams, 50 Mo. 216; Hamilton v. Boggess, 63 Mo. 233. If there is any legal evidence upholding the finding, the appellate court will not reverse. Tucker v. Railroad, 54 Mo. 177. (2) The Missouri and Mississippi rivers are in law navigable streams and a riparian proprietor owns to the water's edge, and is entitled in addition to such lands as may be formed to it by gradual and imperceptible accretions or relictions. Benson v. Morrow, 61 Mo. 345; Rees v. McDaniel, 115 Mo. 145; Cooley v. Golden, 117 Mo. 33; Crandall v. Allen, 118 Mo. 403; Naylor v. Cox, 114 Mo. 232; Cox v. Arnold, 129 Mo. 337; St. Louis v. Railroad, 114 Mo. 13; Buse v. Russell,

86 Mo. 209; Railroad v. Stock Yards, 120 Mo. 541; St. Louis v. Lemp, 93 Mo. 477; Minton v. Steele, 125 Mo. 181; Perkins v. Adams, 132 Mo. 139.   (3)   "Two riparian owners are entitled to share in the accretions in the proportion that the river front of each bears to the entire river front."   Benne v. Miller, 149 Mo. 228.   (4)   "The term high-water and low-water mark can hardly be regarded as applicable to the Missouri river."   Benson v. Morrow, 61 Mo. 351.

MARSHALL, J.—This is an action in ejectment for land in Perry county and described as the fractional west half of fractional southwest quarter of section 3, in township 35 north, range 12 east, and also for certain other land described as follows:   "Beginning at the mouth of a branch on the Mississippi river a short distance below the section line between sections 10 and 11, of fractional township 35 north, range 12 east, thence up said branch or main prong thereof to where the same intersects a north and south line passing through the center of section 10, thence north to the Mississippi river, thence down the same to the place of beginning.   Also, fractional east half of fractional southwest quarter of fractional section 3, township 35 north, range 12 east.   Also, north end of east half of northwest quarter of section 10, township 35 north, range 12 east.   The same being the alluvion attached to said described land and lying between the original and present shore line of said Mississippi river, a more particular description of which is the following, to-wit:   Beginning at a stone, the northwest corner of said fractional section 3, in township 35 north, range 12 east, as surveyed by authority of the United States government and described in field notes as being on the bank of the Mississippi river, running thence south 66.5 degrees east, down high bank, 13 chains; thence south 72.5 degrees east, down high bank, 13 chains, thence south 55.5 degrees east, 23

chains; thence 48.5 degrees east, down high bank, 13 chains; thence south 45 degrees east, down high bank, 20 chains; thence south 56.5 degrees east, down high bank, 10 chains and 50 links; thence south 52 degrees east, down high bank, 9 chains and 80 links, to a post in a branch; thence north 50 degrees east, along said branch, 3 chains and 34 links, to where said branch empties into the Cape Cinque Hommes creek; thence north 54 degrees east, across said creek, 31 chains and 7 links, to a post near the water's edge of the Mississippi river; thence up said river north 25 chains; thence north 13 degrees east, up said river, 16 chains 10 links, to a post near the water's edge; thence west 115 chains and 75 links to the place of beginning, containing 347.19 acres.".

The ouster is laid as of March 1, 1894. The answer is a general denial. The case was tried by the court, a jury being waived, and resulted in a judgment for the plaintiff for possession, and the monthly rents and profits were fixed at ten dollars. The defendant appealed.

The plaintiff claims title by deed from Robert F. Gatewood, dated October 30, 1876, and recorded January 11, 1877, and from Anna Mauer. These grantors were purchasers at the partition sale of the estate of plaintiff's ancestor, C. E. DeLassus, and the plaintiff claims that he and his grantors have been in possession of this land ever since its formation, and of the land to which he claims this land is an accretion, for about fifty years.

The defendant claims title under a partition sale of the Jones estate made in April, 1884, and claims that the land here in controversy is an accretion to Island No. 15 in the Mississippi river, commonly called "Jones's Island."

The respective contentions are easily understood by reference to diagrams, Nos. 1 and 2, made by the plaintiff, and defendant's Exhibit "C," which are as follows:

DeLassus v. Faherty.

Delassus v. Faherty.

DeLassus v. Faherty.

Defendant's Exhibit C.

PLAT LOWER END OF BOIS BRULE BOTTOM.

From these diagrams and this exhibit, which are supported by the testimony of the witnesses, among them the county surveyor, and expert civil engineers, it appears that at the time of the government survey in 1818, Island No. 15 (Jones's Island) was a complete island, an arm or cut-off of the Mississippi river flowing between it and the Missouri shore, while the main channel of the Mississippi river ran between the island and the Illinois shore. At that time Cape Cinque Hommes creek flowed into the Mississippi river at a point between the south end of Island No. 15 and the Big Eddy. DeLassus owned the land south of the Big Eddy and south of Survey 2099, extending along the bank of the Mississippi river. Sometime after 1828 the cut-off between the island and the Missouri shore began to fill up, and ultimately, many years before this controversy began, it was completely filled up, the island was completely joined to the mainland, and for many-years there has been a cultivated field on a part of what was formerly the cut-off, and a public road on another part thereof.

Afterwards, the river began to cut into the bank on the Illinois shore, and land began to form on the Missouri side of the river, opposite the DeLassus property. The plaintiff's testimony tends to show that all the accretions from the Big Eddy down, formed from the shore towards the thread of the river, and gradually extended towards the north and east. The formation nearest the shore was of soft mud and that further away from the shore was sandy. Nearer the shore there were, at intervals, stagnant pools of water or "swag" as some of the witnesses call it.

The Cape Cinque Hommes creek, which formerly emptied into the river at a point north of the Big Eddy, was originally quite a stream of water, in some places as much as eight hundred feet wide, and in times of high water quite good-sized

Vol 164 mo—24

boats, towing barges, ran up it and brought out cargoes of wood, etc.   Now that creek is at some places not over two and a half to three feet wide, and is not in fact navigable except when the whole country is overflowed.

What was once Big Eddy is now all filled up.   As the accretions formed from the Missouri shore towards the north and east, it interfered with the mouth and course of the creek.   The course of the creek has changed several times.   Because the outer part of the new formation was sandy, while that nearer the shore was soft mud, the course of the creek was finally changed so that it cut a new channel through the new formation in front of the DeLassus property, and now runs as the course is shown on diagram No. 2.   In this way the new formation or accretion in front of the DeLassus property is now divided into two parts by the cutting of such new channel by the creek.   But the point most material in this controversy is that the two parts of the accretions in front of the DeLassus property were formed gradually and originally as one formation, and after it was thus formed the creek cut the new channel through the new formation and thus separated the accretions after they had formed into two parts, the creek separating them.   This is the sum of the testimony of the plaintiff and the witnesses, Lewis Dickson, who was 79 years old and had been deputy county surveyor from 1858 to 1862 and from 1873 to 1878, and who was born and raised in the neighborhood; Thomas H. Layton, who was county surveyor for over eighteen years, and who made several surveys of it, the last in March, 1894 ; William R. Wilkinson, who had lived in the neighborhood since 1870; Dr. Robert H. Bush, who had known the conditions since 1855, and had lived on the adjoining land to DeLassus since 1884; A. F. Moldenhauer, who had known the conditions for eighteen years, and who said he "mighty near lived in the creek half of the time," and who said the creek cut through the accretions in

front of the DeLassus property and assumed its present course and bed, in 1886; Adolphus Clifton, who had known the conditions all his life, and who built the cabin on the part east of the creek, for the defendant, about two years before this suit was begun, and who testified that the plaintiff notified him then that the land was his; James Roberts, who had lived near the premises since 1882; Henry Course, who had known the conditions since 1846; Frederick Boehme, who had lived about two miles from the premises since 1858; Jesse DeLassus, who was raised on the land to which the land in controversy is claimed to be an accretion, and Charles R. Swan, who had known the conditions since 1874.

It also appears from the plaintiff's testimony that DeLassus had a warehouse and landing on the accretions for eighteen or nineteen years before the suit was begun, and also that under the judgment in this case the plaintiff will not have as much front on the Mississippi river as he formerly had, and that the lines will be changed so as to give plaintiff and other riparian owners, a river front, and that this change in the dividing lines is made necessary because they formerly fronted on a bend in the river, whereas now the river is practically straight at that point.

On the contrary, the defendant's testimony tends to show that the accretions were made to the south end of Island No. 15 or Jones's Island and not to the mainland, or at least that this is true as to the part which lies north and east of Cape Cinque Hommes creek as it now is, and defendant lays no claim to any part of the land that lies south and west of that creek; that as the accretions formed to the south end of the island it forced the creek towards the south and west until it finally assumed its present course and bed; that the land lying north and east of the creek could not be an accretion to the DeLassus land because the creek always intervened between the two, and that the

creek is and always has. been in fact navigable.

The defendant asked twenty-three instructions, and the court gave ten thereof. It is not necessary to set them out, as those given fully cover every theory of law applicable to the case, and show the principles of law the court applied to the facts found by it.

## I.

The differences between the parties hereto are clean-cut, simple and easily understood. If the land in controversy is an accretion to the DeLassus property, formed by gradual and imperceptible action of nature and joined to the mainland, then it belongs to the plaintiff. [Barney v. Keokuk, 94 U. S. 324; Hardin v. Jordan, 140 U. S. 371; Cooley v. Golden, 117 Mo. 33; Minton v. Steele, 125 Mo. 181; McBaine v. Johnson, 155 Mo. 191; Moore v. Farmer, 156 Mo. 33.] And this is true notwithstanding there must be a change made in the direction of the side lines of plaintiff's property so as to give him proportionally as much river front as he formerly had. [Benne v. Miller, 149 Mo. 228; Crandall v. Allen, 118 Mo. 403; Lamprey v. Metcalf, 53 S. W. Rep. 1139.]

On the other hand, if the accretions were made to the island and gradually extended southwardly, and thereby forced Cape Cinque Hommes creek into its present bed and course, and if that creek always separated the part of the accretions here claimed by the defendant from the part lying south and west of the creek which were joined to the mainland owned by De-Lassus, then the plaintiff has no title and is not entitled to recover, for the plaintiff must recover in ejectment on the strength of his own title and not on the weakness of his adversary's, and "the doctrine of accretions will scarcely admit of jumping a slough forty to sixty yards wide [here Cape

Cinque Hommes creek]. In a word, there is nothing salta-
tory about accretions." [Crandall v. Smith, 134 Mo. l. c.
640.]

The case presented to the trial court by the evidence of the
respective parties was sufficient to support a finding of the facts
either way. That court found the facts to be as the plaintiff
contended. This finding, in this action at law, is not subject
to review in this appellate court. [James v. Ins. Co., 148
Mo. l. c. 16.]

At first blush the fact that the Cape Cinque Hommes
creek separates the two parts of the land here involved, would
seem, of itself, to be an insurmountable barrier to the plaintiff's
right to recover. For as accretions can not be saltatory, but
must gradually and imperceptibly form and attach themselves
to the mainland, the existence of an intermediate stream of
water between the accretions and the mainland makes it im-
possible for the accretions to attach to the mainland. But in
this case the plaintiff has by abundant testimony shown that
the accretions here claimed by the defendant, lying north and
east of the Cape Cinque Hommes creek, originally formed as
a part of the accretions that formed to the mainland and was
originally an unit or whole, and that the Cape Cinque Hommes
creek, after such formation, cut a new channel through the ac-
cretions so formed and in existence and thus separated the ac-
cretions into two parts. If this is true, and the trial court so
found, and that finding must be deferred to by this court in
the conflicting state of the evidence in this case, then the salta-
tory doctrine does not apply, and the accretions on both sides
of the creek remain as much the property of the riparian owner,
as the original land would be if the creek had cut a new chan-
nel through the mainland owned by the plaintiff.

Aside from the positive and direct testimony of the plain-
tiff's witnesses that such is the fact in this case, and outside of

the fact that the south end of Jones's Island, to which the defendant contends the land in suit is an accretion, is about a mile further up the river than the land in suit, the physical facts shown by the testimony of all the witnesses in the case support the finding of the trial court. Those physical facts are the character of the formations, the growth of the trees, and their size and appearance, and the general direction of the watercourses. And when the further fact is borne in mind that the plaintiff formerly had a river front, which he would be deprived of if the defendant's contention is true, and the defendant's holdings would be extended longitudinally down the river and between the plaintiff's land and the river, the justice of the rules of law established in cases herein cited and of the judgment of the trial court in this case is at once made strikingly apparent.

There is no merit in the defendant's claim that he has acquired title by limitation. He had been in actual possession only two years before this suit was begun, and built his cabin on the land in spite of actual notice from the plaintiff that he claimed the land. On the other hand, the plaintiff had exercised such acts of ownership over the accretions from time to time as the character of the formation of the accretions warranted. He had built a warehouse and a landing and had fenced and cultivated a part of the accretions. In such a case the possession of the whole follows the paper title.

We find no error in the giving or refusing of instructions. Those given fully covered the law applicable to the facts proved, and while some of those refused announce correctly abstract propositions of law, they were properly refused, because not applicable to the case at bar.

For these reasons the judgment of the circuit court is affirmed. All concur.