BEN M. ANDERSON, v. T. F. SUTTON, Appellant.

In Banc, August 9, 1922.

1. **ACCRETIONS: Intervening Slough: Caused by Creek.** Where a creek came down from the north and emptied into the Missouri River, and plaintiff owned original shore lands on both sides of it near its mouth, testimony that as the waters of the river gradually receded from the shore line at the mouth of the creek they formed new land against the original shore land; that they cut away the lands near the mouth of the creek, filing up and leaving its then channel near its mouth only a few feet wide; that it cut away nearly all of plaintiff's original lands between the original channel of the creek and the present river channel, but left a few acres thereof; that the channel of the creek moved further up the river, and new lands formed below it and between it and the old channel of the creek, attaching themselves to these few

remaining acres of old land; that the creek waters in ordinary times spread out over this new land, without any definite outlet; that the original channel of the creek above its narrow mouth remained, and in times of high water the confluent waters of the river and creek overflowed these new lands into the creek's original bed, thus forming what some of the witnesses denominate a slough; that the waters of the river did not at ordinary stages run through this slough, but that as they gradually receded the lands in suit were formed against plaintiff's old original shore lands and the few remaining acres of his original lands between the original creek bed and the present river channel, is substantial evidence to support a verdict for plaintiff. The intervening slough was not such a watercourse as constituted a riparian boundary across which an accretion could not pass to attach itself to the main land.

2. **LEADING QUESTIONS: Trial Before Court.** The practice of plaintiff's counsel of propounding questions to his witnesses suggesting the answer desired is not approved; but where the action at law was tried before the court sitting as a jury, and in practically every instance an objection when interposed was sustained, and no specific question to which defendant objected is pointed out, a general assignment that the court erred in permitting respondent's counsel to ask respondent's witnesses leading and suggestive questions will not be sustained.

Appeal from Boone Circuit Court.—*Hon. David H. Harris*, Judge.

AFFIRMED.

*E. C. Anderson, H. D. Murry, D. W. Shackleford* and *Jeffries & Corum* for appellant.

(1) The doctrine of accretion is that since every proprietor whose land is bounded by a watercourse is liable to loss by encroachment of the stream, it is but natural justice that he should own whatever is added to his shore by gradual shifting of the water line. New Orleans v. United States, 10 Pet. 717; Yearsley v. Gipple, 175 N. W. 641; Swearingen v. St. Louis, 151 Mo. 355. (2) Accretions are governed by the same rules whether the stream be navigable or non-navigable. 40 Cyc. 622;

Denny v. Cotton, 22 S. W. 126; Fletcher v. Phelps, 28 Vt. 262; Jakaway v. Barrett, 38 Vt. 322-3; McCormick v. Miller, 239 Mo. 463. (3) A watercourse must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharging itself into another stream or body of water. 40 Cyc. 621; Benson v. Railroad, 78 Mo. 504; San Gabriel Valley Country Club v. Los Angeles Co., 188 Pac. 554. (4) The slough or creek separating the land in controversy from respondent's "high bank" was a watercourse over which accretions could not jump to attach themselves on the opposite side. "There is nothing saltatory about accretion." Crandell v. Smith, 134 Mo. 634; Buse v. Russell, 86 Mo. 214; Withers v. Railroad, 226 Mo. 404; McCormick v. Miller, 239 Mo. 463. (5) A sand bar forming out in the river and extending until it attaches itself to the main shore is not an accretion to the shore. 40 Cyc. 553; Hahn v. Davidson, 134 Mo. 590; Crandell v. Smith, 134 Mo. 633. (6) "It is not within the province of an appellate court to weigh the evidence or make a selection from two or more reasonable conclusions of fact presented by the evidence. Such duties belong exclusively to the triers of fact, but it is the duty of the appellate court to pronounce on the question whether the evidence adduced by a party is substantial, or whether a conclusion of fact falls within the boundaries of reason, and in the performance of that duty the appellate court is not to be controlled by the fact that a trial judge has examined the evidence and pronounced it substantial and has indulged in a conclusion the reasonableness of which is assailed. The appellate court must act in such matters on its own judgment, and if it thinks the evidence supporting the verdict and judgment has no substance, it should reverse the judgment, regardless of what others have thought of the evidence." Scroggins v. Met. St. Ry., 138 Mo. App. 220; Sexton v. Street Ry., 245 Mo. 272; Dyrcz v. Ry., 238 Mo., 47; Wray v. E. L. & W. P.

Co., 68 Mo. App. 380; Zaloutuchin v. Met. St. Ry., 127 Mo. App. 484; Millinery Co. v. Ry., 177 Mo. App. 282; Nugent v. Milling Co., 131 Mo. 253. (7) The probative value of a witness's statements is very much lessened when obtained by means of leading questions which are so put that the witness merely assents to or dissents from a statement or assertion of an examing counsel put with such vocal inflection as to be a question. Burns Lbr. Co. v. Reynolds, 148 Ill. App. 361.

*Irwin & Haley* and *L. T. Searcy* for respondent.

(1) We have no violent dispute with the appellant as to the law in this case, if properly applied to the proven facts. We concede that there is nothing saltatory about an accretion which would cause it to leap a stream, yet upon the other hand respondent contends that at the time of the accretion the creek was not located as it is at present, but came to its present location by avulsion long after the accretion was formed. This was our contention in the court below, and in this we are supported by ample evidence and a favorable finding by the trial court.

This case is almost parallel with the case of De-Lassus v. Faherty, 164 Mo. 361, except the facts in this case are much stronger than in that case. The case of Miller v. Bufton, 275 Mo. 35, cites with approval the case of DeLassus v. Faherty, in a case where the facts are quite similar to those in the case at bar. (2) The testimoney of witnesses that there is a five-acre tract of high land, covered with large timber along the northern boundary and west of the old bed of Bonne Femme Creek, which was never washed away and which formed a part of Anderson's original tract, is alone sufficient evidence to support the verdict of the court. (3) Counsel for appellant complains that respondent's counsel asked leading questions. The case was tried before the court and any error in this respect was harmless. Besides no exception was taken as to the adverse ruling of the court.

ELDER, J.—This is an action to determine title to approximately 320 acres of land in Sections 21, 22, 27 and 28, Township 46, Range 13, Boone County, Missouri.

The petition alleges that plaintiff is the owner of said land in fee and that defendant claims adversely thereto. The answer denies the ownership of plaintiff, avers that defendant is the owner in fee, and alleges that he is in possession.

The cause was tried by the court, resulting in a judgment in favor of plaintiff. No instructions were asked or given, and the court made no findings of fact. From the adverse judgment rendered, defendant has appealed.

The respective contentions can best be understood by reference to plaintiff's Exhibits "A" and "D" and defenadnt's Exhibit 6, which are found on pages 200, 201, and 202, following.

As will be observed, plaintiff's exhibit "A" is a Government survey made in October, 1916. Plaintiff's Exhibit "D" was taken as to topography mainly from a survey of 1879, and as to shore line from a survey of 1890. Defendant's Exhibit 6 was constructed by P. S. Quinn, County Surveyor of Boone County. He testified that he made the survey therefor in April, 1895, taking notes "from the original Government notes on file here." The land in controversy comprises part of the 110-acre tract and the 262-acre tract shown in the lower left hand corner of defendant's Exhibit 6.

Plaintiff claims by virtue of accretion to the shore line of lands purchased by him from one John Girard in 1896. Defendant rests his claim upon deeds from Boone County and from one Conley and wife, both executed in 1912.

It is admitted that plaintiff owns all that part of New Madrid Survey No. 97 which lies north and east of what is designated in the testimony as the slough or creek. (See defendant's Exhibit 6, tract marked "Anderson.") Subsequent to 1817 an island, commonly known as "Johnson's Island," also designated on some of the Govern-

Anderson v. Sutton.

Anderson v. Sutton.

ment surveys as "One Thousand Island," formed in sections 9, 16 and 21. A number of small bars and islands united to form this island, among them being islands 33, 34 and 40 shown at the top of defendant's exhibit 6. (Also see plaintiff's Exhibit "D.") Some time in the '80s another island, sometimes referred to as Wright's Island and sometimes as Edward's Island, was formed to the west and south of Johnson's Island. (See defendant's Exhibit 6, also plaintiff's Exhibit "D.") This island was surveyed by Quinn, the county surveyor, in 1895. The, county court sold the northern part of this land to E. D. Johnson, the middle portion to H. T. Wright and the southern portion to P. Edwards. (See defendant's exhibit 6). About the year 1883 or 1884 the Missouri River cut into what is designated on defendant's exhibit 6 as "Bonne Femme Creek," at a point some hundred yards or somewhat less than a quarter of a mile north of the northern line of plaintiff's land. At that point the waters of the creek thereafter emptied directly into the river, departing from the old channel, and from thence onward the waters of the river and creek mingled. Defendant claims that the confluent waters of the river and creek washed away all of plaintiff's land which lay west of the old bed of Bonne Femme Creek. According to the witness Girard, who was one of the original owners of plaintiff's land (having purchased the same in 1883 and having lived thereon since 1877), all of plaintiff's land was not washed away, but a small triangular tract was left untouched. The witness Cauthorn spoke of this tract as a high bar of five acres lying "west of the old creek bed." As we gather from the argument and briefs, it is the contention of plaintiff that the river reached its most eastern shore line about the year 1884, that it then receded to the west and refilled the entire eastern shore line, causing accretions to form to the triangular tract which was not washed away and adding land to the shore line all along plaintiff's front, as well as to the west and south ends of the so-called Wright's or Edward's Island. It is the

contention of defendant that all of New Madrid Survey No. 97 to the west and south of what is designated on defendant's exhibit 6 as the "high bank" was carried away by the river, that after a few years, bars began to form in the river within the former boundaries of the said survey, and that as these bars grew and spread they pushed the main channel of the river west and south. The real question then is whether the newly formed land to the west and south of the so-called slough or old creek bed, within the former boundaries of New Madrid Survey No. 97, is an accretion to plaintiff's land lying north and east of the slough or creek. This question must be determined in the light of the evidence, bearing in mind the rule that substantial evidence is sufficient to support the judgment rendered.

I. Defendant contends that the trial court erred "in determining that all of the land in controversy was accretion to respondent's high bank or main shore to the eastward of the slough or creek." Stating his claim of error differently, defendant insists that the court erred "in determining that the slough or creek running by respondent's high bank or main shore was not of such character as could constitute a riparian boundary." It is persuasively argued on behalf of defendant that the slough or creek separating the land in controversy from plaintiff's "high bank" was a watercourse which accretions could not jump to attach themselves on the opposite side, and that "there is nothing saltatory about accretion," quoting from Crandall v. Smith, 134 Mo. l. c. 640. The evidence bearing upon the question at issue is conflicting.

Slough.

For defendant, the witness Gibbs speaking of the slough, said: "I have never been there but what there is water in it. I have been across there a number of times. I have taken stock across the pasture, different times, and had to come up through the Wright land to get through it.  .  .  .  The only time that ever I have

been able to cross it going from Anderson's land would be when it was frozen up.''

P. S. Quinn, testifying for defendant, stated that when he surveyed Wright's or Edward's Island in 1895, the slough or ''big arm of the river'' was 825 feet across and ten to twelve feet deep. On cross-examination he testified:

''Q. How did you get across to measure the distance? A. There was no water in it at that time.

''Q. Well, you knew what an island is at the time you surveyed it? A. Yes, sir—it was.

''Q.. What made you call it an island, was it permanently surrounded with water? A. No, sir, not then.

''Q. You say you surveyed right across on the line, which I will have you mark as line 'C'? A. All right.

''Q. And you also surveyed across what is marked the 'Big Slough,' 'D'; there was no water in it there, you say? A. No water at that time.''

P. F. Edwards testified that when he acquired his first tract of land in 1890 ''there was water running through there (the slough) all the time. I had me a flat boat made and I crossed my work stock in this boat, for farming.'' On cross-examination witness stated that Johnson Island had not been an island for thirty years; that the land he owns is below Johnson Island, with another tract intervening; that there was no water between his land and the intervening tract; that the land he owns ''formed out in the river and gradually made until it came back to this land, the high land.''

''Q. Now I will ask you if it isn't true that it was building down in here at the same time it was building along here, all along Anderson's land at the same time? A. Yes, sir, it was.''

J. D. Calvin stated that he crossed the slough in 1904 or 1905 in a boat. ''Mr. Edwards had a boat there and we crossed our horses with that.'' On cross-examination witness stated that the slough was skirted on both sides with timber.

"Q. That large timber extends down just across the line, on Anderson's land? A. I don't know how far it goes.

"Q. And after you cross over the north line for a short distance, then you have a different growth of timber from there on down towards the river? A. Well, it is willows mostly and a few cottonwood.

"Q. It is a lighter growth? A. Yes, sir. It is not as old land, I suppose, out there, as the other."

With respect to the formation of the land opposite plaintiff's land witness testified:

"Q. Now, is it not a fact that the river, where it flows east and west, south of this Anderson land, simply receded to the south, along about 1894? A. Of course, it has left that bank now.

"Q. And it has been against that bank ever since— the south bank? A. Well, it is on the south side, yes, sir.

"Q. And it has been cutting and receding southwardly? A. I don't think it has cut any—oh, you mean across the river?

"Q. Yes. A. Oh, yes.

"Q. And what did it do on the opposite side from the south side? A. I suppose it began to fill in.

"Q. And it began to fill in on the Anderson side at the time it began to cut on the south side? A. I suppose it would.

"Q. Now, what time did the current shift and begin to cut over there? A. I don't know.

"Q. Wasn't it after the formation of the island by the Johnson Island which shifted the current to the opposite side? A. I guess so.

"Q. And the current went to the south shore in an easterly direction, and it began to cut the south shore and lap the bank over on the Anderson land? A. Yes, I guess so."

On cross-examination Wesley Nichols, a witness for defendant, testified that when Wright's or Edward's Island formed by the side of Johnson Island the current of

the river began to change, shifted to the other side and receded south of the Anderson land.

"Q. And then it began to fill up—A. Fill up behind on that land.

"Q. And Bonne Femme Creek, when it would come out it would fill in there with mud and silt as the river receded south? A. Yes, sir.

"Q. And Bonne Femme Creek would cut out a new channel through there? A. Of course it would cut the mud out.

"Q. But the filling in there was upon both sides of the channel of Bonne Femme? A. Yes, sir.

"Q. And it filled from the south to the north, didn't it? A. Yes, sir.

"Q. And it didn't fill from the—by accreting behind these islands, but it receded? A. Of course it dropped down on the other side and filled in on the upper side.

"Q. And in that way the land known as the Anderson land filled down towards the south? A. Well, it filled out a little further than his land, I think.

"Q. And his land is now longer than it was when you first knew it? A. The land reaches out further towards the river. The island was formed further out, I think, than after he went out. I knew the land before the fill in the river. A state road used to run down the river there.

"Q. But, I say, the current of the river flows east, past the Anderson land? A. Yes, sir.

"Q. And it cut the south bank and filled up on the north bank? A. Yes, sir.

"Q. And it didn't do that until after the current changed? A. No, sir.

"Q. And the current didn't change until after the islands had formed up at the head? A. Well, it cut off about forty acres of the Johnson land.

"Q. But finally the river changed and the current went over on the other side? A. Yes, sir.

"Q. But that was due to the formation of the island there? A. Of course it was."

George Glasscock, called by defendant, stated on cross-examination:

"Q. I will ask you if the formation of the land now in question is not due to the fact that the river shifted to the south and put its sediment on the opposite side of the river at that point? A. Yes, sir, I suppose it is.

"Q. As it receded to the south, the land filled up and made the land that you are now talking about? A. Yes, sir.

"Q. And that is the way it was made? A. I suppose it was.

"Q. And Bonne Femme branch came down there and when there would be an overflow of course it lost its identity and when the river would go down it would thread its way through this mud and silt? A. Yes, that is—

"Q. That is your recollection about it? A. Yes, sir.

"Q. And it would cut down steep banks and those banks would cave in as deep as the fill had been? A. Yes, sir.

"Q. Simply boring it's way down through the mud and silt? A. Yes, sir.

"Q. And sometimes it would go back in the same course and sometimes it would go in a different course? A. Well, I don't remember whether it changed or not.

"Q. Do you remember of this land, known as the Sutton land or what Sutton claims now, ever being an island at any time? A. No, sir, I don't know as I do."

John Girard, from whom plaintiff purchased, testified in part as follows:

"Q. Explain to the court how the waters out of the Bonne Femme Creek would get out after a flood? A. Well, every time we had high water in the river, it would shut up the mouth of the creek. Sometimes it would open out a little lower and sometimes above this point (indicating). It depended on the soft mud—if the water could percolate through.

"Q. Would it form a new channel each time you had an overflow? A. Pretty near each time. I never saw it twice in the same place.

"Q. How wide would that creek be? A. Sometimes about that wide.

"Q. Well, how many inches? A. About two feet. When the water had not cleaned out the mouth of the creek, there was just a little water there.

"Q. Was there ever any slough in through this land after it began to fill back? A. No, sir.

"Q. Of any kind? A. No, sir.

"Q. Was there any standing water in there? A. No, sir.

"Q. Could you always walk across there when the river was at low stage? A. Yes, sir; on this part here, I had a watermelon patch and seed potatoes. Along the creek it was higher land.

"Q. When did the willows begin to grow here? A. They began growing there about 1885. . . .

"Q. Did those little islands or formations along up there near the shore have anything to do with the filling in of this land down here (indicating)? A. No, sir, not at all. This was about the first that filled up. This is the first that filled up. . . .

"Q. Now, what I am trying to get—you say this Bonne Femme Creek flowed out in different directions across this whole bottom? A. Yes, sir, from Press Edward's land, it scattered all over here.

"Q. And part of the time it didn't flow over your land at all? A. No, sir.

"Q. When did it turn back upon and flow over your land? A. Well, sometimes it came there late in the fall.

"Q. About what year? A. Well, about 1886 or '7.

"Q. At that time it flowed back through your land, was this low bottom land in there? A. Yes, sir, that was all low, but in this part that was cultivated before I sold it."

W. B. Cauthorn, civil engineer, who surveyed plaintiff's land in 1896 or 1897, testified:

"Q. State to the court whether or not at the time you made this survey, there was any indication of the Bonne Femme Creek, or any other creek, down through that sand bar at that time. A. Not over the sand bar, because it flared out.

"Q. It simply emptied at what point? A. Well, as indicated on the map there at the high bank.

"Q. From that point, where did the waters of the Bonne Femme go? A. Well, at that point that bed was dry. But if there was ever any water in there, it would have to spread over that bar.

"Q. Was there any marked break in the bar at any place? A. No; it was a flat bar that sloped out to the water level.

"Q. Do you mean to say that was flat bar from the high bank of the Anderson land out to and across what is now called the Sutton land? A. It is flat bar out to the river front. I don't know what you call 'the Sutton land'."

An analysis of the foregoing testimony leads us to conclude that there was substantial evidence to sustain the judgment. It is clear that during the past several years the course of the Missouri River has shifted to the south and west. It is equally clear that the accretion in front of plaintiff's original land has been gradual. Manifestly the same was caused by the recession of the river from its former shore line and the deposit of silt and sand resulting from floods and high water. After the river cut into Bonne Femme Creek the waters of the creek emptied directly into the river. This left the old bed of the creek without any regular supply of water except such as would be gathered from the adjoining hills and ravines. During high water, however, the confluent waters of the creek and river above would overflow into the old channel of the creek. This overflow water, coupled with the gathered surface water, formed the so called slough to which the

witnesses refer.  At times, however, it was evidently dry.
As shown by the testimony of the witness Girard, who
logically was better acquainted with plaintiff's land and
the accretions than any other witness who testified, all
of plaintiff's land to the west of the slough was never
washed away by the river.  This was corroborated by the
witness Cauthorn.  The accreted land therefore attached
to the old portion which remained as well as all along
plaintiff's original shore line or main land.  And the in-
tervening slough could not be characterized as such a
watercourse as would constitute a riparian boundary
across which an accretion could not jump to attach it-
self to the main land.

In DeLassus v. Faherty, 164 Mo. 361, where a well-
defined running creek cut a new channel through land pre-
viously accreted to the main land, and thus separated the
accreted land in two parts, it was held that the riparian
owner's right was not thereby affected.  By analogy of
reasoning the principle there enunicated is applicable
here, where the slough or creek was not, during the
formation of the accretion, a flowing stream with a defi-
nite channel, and where part of the land in controversy
has never been separated from the main land.

Defendant's contention must be ruled against him.

II.  Defendant urges that the court erred "in per-
mitting counsel of respondent to ask respondent's wit-
nesses leading and suggestive questions."  We have not
been favored with a citation as to the specific
questions to which defendant objects.  An ex-
amination of the somewhat voluminous record

Leading
Questions.

discloses, however, that in practically every instance
where an objection was interposed it was sustained by the
court.  Moreover, the trial having been before the court,
who is given to weighing the evidence in the light of all
the circumstances attending its presentation, we do not
believe that defendant's interests were prejudiced by the
conduct complained of.  While not lending approval of

the practice of propounding questions in a manner to suggest the answer desired, we do not feel that the record before us reveals a sufficient dereliction to warrant a reversal.

From what has been said it follows that the judgment of the circuit court should be affirmed. It is so ordered. *Woodson, Graves, Higbee* and *David E. Blair, JJ.,* concur; *James T. Blair, C. J.,* not sitting; *Walker, J.,* absent.