Benson v. Morrow, et al.

Y. BENSON, Plaintiff in Error, *vs.* JOHN MORROW, *et al.*, Defendants in Error.

1. *Missouri river in law a navigable stream—Riparian rights on.*—Under the acts of congress and the decisions of the United States Supreme Court (7 Wal., 272) the ancient doctrine distinguishing navigable and non-navigable rivers by their position above or below tide water, is done away with, and the Missouri river is a navigable stream. And hence, as in other cases of navigable rivers, the proprietor of land on its banks owns only to the waters edge.

2. *"Avulsion" and "gradual accretion."*—The terms "avulsion" on the one hand, and "gradual and imperceptible accretion" on the other, may with propriety be dispensed with in speaking of alluvion formed by the Missouri river.

3. *Alluvion attached to island in the Missouri river— Question of title, how determined.*—An unnamed and undisposed of island in the Missouri river belongs to the United States, and if alluvion forms thereto and extends thence in the stream so as to connect with another island belonging to a private owner, he does not thereby become the owner of the alluvion so formed. But so far as concerns the title of such owner, it makes no difference whether the nameless island belongs to the United States or to some individual citizen. If, on the other hand, the alluvion forms, not to the nameless island, as in the case supposed, but to the other one, he who owns the latter becomes entitled to such accretion.

*Error to Osage County Circuit Court.*

*Lay & Belch,* for Plaintiff in Error.

Plaintiff acquired title to all alluvion, whether formed by accretion or avulsion, if permitted to cement to plaintiff's islands. (3 Wash. Real Prop., 59 ; Ang. Wat. Cours., 60 ; Trustees, &c. vs. Dickerson, 9 Cush., 454; 5 Pet., 467 ; Ang. Wat. Cours., 54.)

The second instruction asked by the defendant should have been refused. Although the Missouri River is, by act of congress, declared a "common highway," and in fact navigable, it is not in law a navigable stream. Hence, it does not follow that an unsurveyed island is the property of the United States. Nor is it true that, although this land may have been first formed by an island near those of the plaintiff's, and by gradual accretion to either or both, so as to entirely cement the two. the land so formed would belong to the government. The Government granted to plaintiff's lands bounded by waters of the Missouri river. A valuable part of this

grant of property was riparian rights, and the Government could not come in and deprive these parties of this part of the grant, any more than it could of the land itself.

*Ewing & Smith,* for Defendants in Error.

The Missouri river at the site of the islands is a public highway. (1 U. S. Stat., 468, § 9; 3 U. S. Stat., 548, § 2; 2 U. S. Stat., 666, § 12; Id., 701, § 1.) Said enactments do away, in the United States, with the common law doctrine that rivers are not navigable except within ebb and flow of tide. All navigable rivers in this country are public highways, (10 Wal., 557; 11 Wal., 411) and the title to lands bordering on navigable water stops at the stream. Riparian owners are entitled to no rights incident thereto, except the contingent right of alluvion and *derelictum.* Hence, the soil formed under such streams remains forever in the United States. (R. R. Co. v. Schurman, 7 Wal., 272; S. C., 10 Minn., 82; Martin vs. Madden, 15 Pet., 367; Russell vs. Jersey Co., 15 How., 426; Patterson & Newark R. R. vs. Stephens, 10 Am. Law Reg., 165; 3 Washb. Real Prop., 55.)

The facts in this case, as we contend, are that a small island embracing a few acres of land was situate in the Missouri river; that this island had never been surveyed, numbered and put in market by the United States. The title thereto remained vested in the United States. A mile or thereabouts below this island were situate in the same river several islands that had been surveyed and numbered, and had been granted by the United States to an individual, under whom plaintiffs claim title. In the great flood in this river in 1844, the upper part of this small island belonging to the United States was carried away, and a large and extensive addition and deposit of alluvion were added to the lower end of it. This addition extended down to one of the islands claimed by plaintiffs, so that a union of the two islands was virtually effected, there remaining only a slough or low run between the upper end of plaintiff's island and the deposit added to the lower end of the island of the United States. Thus were formed many

acres of land, which the plaintiffs claim now belong to them.

Alluvion never accumulates at the upper end of an island in a rapid stream like the Missouri, but always at the lower end or on the sides. Hence, the deposit was made and formed and attached to the Government island. And under the law, the alluvion occasioned by the avulsion in this navigable river, and attached to an island which was the property of the United States, also became and is the property of the public and is no more the property of the owners of Island 54 than the island itself, which is the property of the Government.

NAPTON, Judge, delivered the opinion of the court.

The plaintiffs in this ejectment suit were owners of three islands in the Missouri River, numbered 53, 54 and 55, and sued to recover possession of certain lands which were alleged to be accretions to one or two of said islands by alluvion.

The facts are not stated, nor the evidence—but it is stated that evidence was offered in support of the theories maintained by each side in the instructions offered.

The three islands, belonging to plaintiffs, were located in the river in the order of their number, No. 53 being the uppermost and No. 55 being the lowest down stream. The plaintiff's claimed that the land occupied by defendants was an accretion to island No. 55 or 54. The defendants contended that the lands they occupied were accretions to an unnumbered and unsurveyed island belonging to the United States.

The instructions given by the court at the instance of the defendants, were :

1. The term accretion as used in the instructions, means the gradual and imperceptible process of adding to land by the washings of the Missouri river, and the result of such process is termed alluvion, or made land.

2. The Missouri river is a public river, and all islands therein situate at the time the territory of this State was sectionized by the United States, and not then or subsequently sur-

veyed and numbered, and which have not been disposed of by the United States, still remain with all accretions thereto the property of the said United States Government. And if the jury believe from the evidence that the lands occupied by defendants are an unsurveyed, unnumbered, undisposed of island, with its accretions, by the United States Government, then the title of said island and its accretion, or alluvion, is in said United States, even if the said islands, accretions, or alluvion have extended to No. 55 and connect with it—and said island and its accretions are not the plaintiff's and the jury will find for defendants.

3. If the jury believe that the lands occupied by defendants were made by the violent action of the waters of the Missouri river in 1844 and 1845, suddenly and immediately, then the same is not the property of the owners of the west or upper end of island No. 55, but is the property of the United States, although they extend down to and connect with the upper or west end of island No. 55.

4. The question submitted to the jury is, whether the lands occupied by defendants are islands No. 53, 54, and 55, described in plaintiff's petition—or are an island, with its accretions, other than and different from said islands 53, 54 and 55.

5. It devolves upon the plaintiffs to show by evidence, that defendants are occupying the identical islands and accretions described in plaintiff's petition or some part thereof.

The court gave these instructions and two others, of its own motion, to-wit:

1. The court instructs the jury that the lands described in the petition as the S. E. fr. quarter of section 17, T. 45, R. 8 west, and all those lands described in section 16 at the time of their entry at the land office, were bounded by the Missouri river, and the same are admitted by the pleadings to belong to plaintiffs—and if the jury find from the evidence that the defendants occupied the same or any part thereof at the commencement of this action—or any lands that are the products of gradual accretion to the same, they will find for plaintiffs.

2. The court also instructs the jury that the lands described as fractional sections 19 and 20 on islands 53 and 54 were also, when entered, bounded by the waters of the same river, and are admitted to belong to the plaintiffs; and if the jury shall find from the evidence that at the time of the commencement of this action, the defendants occupied the said land or any part thereof, or any lands that are the products of gradual accretions to the same, they will find for plaintiffs.

There was a verdict and judgment for defendants.

After the acquisition of the northwest territory from Virginia, and before the purchase of Louisiana in 1804, the United States established, perhaps in '98 or thereabouts, a system of surveys of their public lands, and passed laws in regard to the Mississippi and Missouri and other navigable streams, which materially modify the applications of the common law and civil law doctrines in regard to riparian ownership. The title to nearly all the lands in Missouri depends on the laws of congress and the system of surveys adopted by congress.

I have heard it stated by an eminent lawyer, who practiced in this State long before it was admitted into the Union, that there are only one or two complete Spanish grants in this State. Our public surveys terminate on the Missouri river, and it is the same with regard to the Osage as high up as Osceola, and the Gasconade for some distance, and no doubt some other streams—but the surveyors pay no regard to smaller streams not considered navigable, and sectionize them as though such streams had no existence. This may perhaps serve as a test of the navigability of a water course, since we have no navigable streams in this western country which come within the common law or civil law definition of this term.

However this may be, it is certain that the Missouri river is declared a navigable stream by act of Congress, and that the doctrine of riparian property, as established in regard to non-navigable streams is not applicable to this river. The ancient doctrine, distinguishing navigable and non-navigable

rivers, by their position above or below tide water, is still adhered to in most of the older States; but it is distinctly repudiated by the Supreme Court of the United States in R. R. Companies vs. Schurman (7 Wal. 272) and indeed could not well be reconciled with either the acts of congress in relation to our large rivers, or the system of public surveys adopted by congress.

The rule in regard to non-navigable streams is very clearly stated by Chief Justice Shaw in Deerfield vs. Arms (17 Pick. 42). "It seems very clearly settled," says Judge Shaw, "that upon all rivers not navigable (and all rivers are to be deemed not navigable above where the sea ebbs and flows) the owner of land adjoining the river, is *prima facie* the owner of the soil to the central line or thread of the river, subject to an easement for the public to pass along and over it with boats, rafts and river craft. This presumption will prevail in all cases, in favor of the riparian proprietor, unless controlled by some express words of description which exclude the bed of the river. In all cases, therefore, where the river itself is used as a boundary, the law will expound the grant as extending *ad filum medium aquæ.* We also consider it a well settled principle of law, resulting in part from the former, that where land is formed by alluvion in a river not navigable, by slow and imperceptible accretion, it is the property of the owner of the adjoining land, who, for convenience and by a single term, may be called the riparian proprietor, and in applying this principle it is quite immaterial whether this alluvion forms at or against the shore, or whether it forms in the bed of the river and becomes an island. And where an island is so formed in the bed of a river, as to divide the channel and form partly on each side of the thread of the river, if the lands on the opposite sides of the river belong to different proprietors, the island will be divided according to the original thread of the river, between the several proprietors."

This doctrine is quoted by Chancellor Kent in his discussion of riparian rights (3 Kent Com., 427, 12 ed.) and is sub-

stantially asserted in all the text books on this subject. (Ang. Wat. Cours. tit. Alluvion.)

The basis of this doctrine is found in the law of nations, and so far as the principle on which it rests is concerned, that may well be regarded in all its varied applications. That principle is, that, "he who bears the incidental burdens of an acquisition, is entitled to its incidental advantages; consequently, that the proprietor of a field bounded by a river, being exposed to the danger of loss from its floods, is entitled to the increment which from the same cause may be gradually annexed to it." (Smith vs. The Public Schools, 30 Mo., 300.) And thus far the principle will apply to riparian owners on the Missouri river, or owners of islands in the midst of the stream.

But the application of the principle as made by the text writers and judges to non-navigable streams, cannot be transferred to our great public rivers. The proprietor of land on the banks of the Missouri river does not own *ad filum aquæ*, but only to the waters edge. though undoubtedly still entitled to whatever increment may be added to his land. He is not, however, the owner of an island that springs up in the midst of the stream, whether the island be on one side or the other of the thread of the river. He goes only to the margin of the river. (The Schools vs. Ruley. 10 Wal., 110 : R. R. vs. Schurman, 7 Wal., 272; Yates vs. Milwaukee, 10 Wal., 504.)

Nor is the doctrine concerning rivers deemed navigable at the common law altogether applicable to our western rivers. That doctrine is, that the right of soil, of owners of land bounded by the sea or navigable rivers, where the tide ebbs and flows, extends to high water mark, and the shore below common, but not extraordinary high water mark, belongs to the State, as trustee of the public; and in England, the crown, and in this country the people, have the absolute proprietary interest in the same. (3 Kent Com., 427, 12 ed.) The terms high water and low water mark can hardly be regarded as applicable to the Missouri river.

The term "avulsion," on the one hand, and "gradual and imperceptible accretion," on the other, are used by writers on alluvion to contradistinguish a sudden disruption of a piece of ground from one man's land to anothers, which may be followed and identified, from that increment which slowly or rapidly results from floods, but which is utterly beyond the power of identification.

We may with propriety dispense with such terms when speaking of alluvion formed by the Missouri river, as only calculated to mislead. When land is torn from the banks of this stream, and plunged into its turbid waters, its component parts are never after distinguishable—the sand and clay and soil, and trees, and roots and logs are soon utterly undistinguishable from any other similar substances, and their destination can never be traced, except that they ultimately go into the Gulf of Mexico, unless previously to reaching the ocean, they are deposited on either bank or on some island. Mr. Livingston well observed in regard to this doctrine of " gradual and imperceptible accretion ;" "When the ingenious counsel can analyze the different deposits, separate the sands of Red River, the rich mould of the Missouri from the clay and other various soils which the Mississippi receives from a thousand tributary streams—when he can dive into its turbid eddies, watch the moment of its precious deposit, and date the existence of each stratum of its increase, then the first branch of the authority he has cited (*quantum quoque temporis adjiciatur*) may be applicable to his cause." (2 Hall. L. J., 307.)

Even in Great Britain, Chief Justice Abbott has criticised the word "imperceptible," as used in this connection by judges and law writers. He observed that, "in these passages, Sir Matthew Hale is speaking of the legal consequences of such an accretion, and does not explain what ought to be considered as accretion, insensible or imperceptible in itself, but considers that as being insensible, of which it cannot be said with certainty, that the sea was ever there." (The King vs. Lord Yarborough, 3 Barn. & Cress., 91.)

The first and third instructions for the defendants should not have been given. The definitions to the jury therein, of avulsions and accretions, though copied from the text books, might, for reasons already indicated, have misled the jury. Accretions in 1844 or 1845 might have created alluvion as well as if they had been twenty years in their accumulation. The length of time during formation is not material.

The real questions of fact on which the case turned, are correctly propounded in the two instructions given by the court, (omitting, as they should, the word "gradual") and in the 2d, 4th and 5th instructions asked by defendant.

If the alluvion in question was formed to a nameless island, lying above island 55, which ultimately before suit extended down to and connected itself with island 55, neither the alluvion or the nameless island belonged to the owner of island 55. This unnumbered island belonged to the United States; but suppose it had been sold to a private citizen, and the alluvion formed at its lower end ultimately extended to island No. 55, would the owner of island 55 become the owner not only of the alluvion, but of the nameless island itself? It makes no difference in the application of the principle, whether the nameless and unsurveyed island belonged to the United States or to some individual citizen.

Suppose the channel of the river between an island and the mainland is left dry by the water, and entirely filled up with deposits of mud, and the island and mainland are at last one continuous tract of land, could the owner of either claim the entire tract? Certainly the newly formed land would belong to the United States, or it would be divided between the opposite owners, upon the common law principle, applicable to non-navigable streams, of each going to the thread of the channel, as it was before it was deserted by the water. In the event supposed, the river might be regarded as ceasing to be a navigable one, *pro hac vice*, or rather as being converted, at the slough between the island and the shore, into a non-navigable one. In any event the owner of the shore could not claim both the alluvion and the island, nor *vice*

23—VOL. LXI.

*versa*, could the owner of the island claim the tract on the bank, with its accessions by alluvion.

The instructions asked by the plaintiffs are substantially given by the court in its two instructions.

If the alluvion was formed to island No. 55, or island 54, and not the nameless island spoken of, the plaintiffs were entitled to recover, otherwise not ; and that depended on facts not fully disclosed in the records, or fairly passed on by the jury.

The judgment is reversed and the cause remanded. Judges Wagner and Sherwood concur ; Judges Vories and Hough absent.