L. E. HECKER v. EMIL C. BLEISH and CHARLES GILES, Appellants.— 3 S. W. (2d) 1008.

Division One, March 3, 1928.

*Randolph & Randolph, Frank Petree* and *A. M. Tibbels* for appellants.

*E. E. Richards, Floyd M. Sprague* and *Chas. H. Mayer* for respondent.

SEDDON, C.—Plaintiff (respondent) sues in ejectment, alleging in his petition that on October 3, 1922, he was entitled to the possession of the following described premises situate in Holt County, Missouri, to-wit: "All land of island formation in the Northwest Quarter of Section Twenty-four (24), Township Sixty-three (63) of Range Forty-one (41), same being the fractional Northwest Quarter of Section Twenty-four (24), Township Sixty-three (63), of Range Forty-one (41), containing 158.909 acres, more or less, except therefrom a strip of land thirty (30) feet wide beginning at the Northwest corner of the Northwest Quarter of Section Twenty-four (24), Township Sixty-three (63), of Range Forty-one (41) and running East to a point 14 chains East of the Northwest corner of the Northeast Quarter of the Northwest Quarter of Section Twenty-four (24); also a strip of land sixty (60) feet wide the center line of which begins 14 chains East of the Northwest corner of the Northeast Quarter of the Northwest Quarter of Section Twenty-four (24), Township Sixty-three (63), of Range Forty-one (41); thence South four (4) chains; thence East five and sixty-three one-hundredths (5.63) chains to the half section line running North and South through said Section Twenty-four (24), Township Sixty-three (63), of Range Forty-one (41) reserved for the purpose of public road;" that defendants entered upon said premises on October 3, 1922, and unlawfully withhold from plaintiff the possession thereof, to his damage in the sum of $1000; that the value of the monthly rents and profits is $125; wherefore, plaintiff prays judgment for recovery of said premises and for damages and rents and profits until possession of the premises be delivered to plaintiff.

Defendant (appellant) Bleish filed answer, denying generally the allegations of the petition, except such as are specifically admitted in the answer; claiming title to the described premises and denying that plaintiff has any right, title or interest therein; admitting defendants' possession thereof; alleging that part of the described lands are made or accreted lands that have formed to the original shore line of the Missouri River by accretion or reliction; pleads the several statutes of limitation applicable to real actions as a bar to plaintiff's action; pleads that plaintiff and his immediate grantor and patentor, Holt County, are and should be estopped in equity and good conscience from claiming said land, or any right, title or interest therein, by reason of Holt County having assessed said land for taxation and collected taxes thereon, having allowed defendant to purchase said land for a valuable consideration without notice that the county was claiming title thereto, having permitted defendant to clear and cultivate much of said land and to erect valuable improvements thereon, and having denied to defendant the preferential right to purchase said land and procure a patent from Holt County thereto upon payment of the amount fixed by the County Court of Holt County as

the purchase price for said land; alleges that the patent purporting to convey the described land to plaintiff was fraudulently issued by the County Court of Holt County; and prays that the patent from Holt County to plaintiff be cancelled, set aside and for naught held, and that defendant be decreed to be the owner of said described land and that title thereto be declared to be vested in defendant.

The answer of defendant (appellant) Giles, who is the tenant of defendant Bleish, is a general denial. Plaintiff filed a reply to the answer of defendant Bleish, denying generally the allegations of said answer.

The cause was tried by the court below without a jury, the record reciting a waiver of jury by the parties. No demurrer to the evidence was presented by defendants, and no declarations of law were asked by either party or given by the trial court. The trial court made no findings of fact, nor was the court requested so to do by either party. Judgment was in favor of plaintiff for recovery of the possession of the premises as described in the petition, together with the sum of one dollar as damages for the withholding of said land from plaintiff, and $100 per month as the value of the rents and profits of said premises until plaintiff be restored to possession thereof, and execution was ordered to issue. The judgment also recites that ''the court doth further find, order, adjudge and decree that the plaintiff is vested with the fee-simple title to the real estate hereinabove described, and the court doth further find, order, adjudge and decree that the defendants, or either of them, or any one claiming under them, have no right, claim or interest in said real estate, or any title whatsoever, either legal or equitable, in and to said real estate, or any lien thereon.'' From the adverse judgment thus rendered, defendants have appealed to this court.

Plaintiff grounds his claim of title and right to possession of the land in controversy upon a patent from Holt County conveying to him the described land as ''lands of island formation.'' Plaintiff claims that the land in controversy is a part of made or river-bed land which first formed as an island in the Missouri River, and that the island, by reason of accretions attaching thereto, gradually grew larger, and after a considerable time extended to the east shore line or high bank of the Missouri River, and thereby filled up and closed a channel of the Missouri River which had existed for some years between the island and the east shore line or high bank of the river. Defendants claim, and they sought to show, that no island ever formed or existed in the vicinity of the land in controversy, but that the land in controversy is, and always has been, a distinguishable and integral part of lands which had been owned in fee simple by defendants' predecessors in title since the issuance of a patent therefor by the State of Missouri in 1848 and which had been deeded to defendants, or that the land in controversy had accreted to defendants' deeded

lands. · Hence, the main issue tried was whether the land in controversy is of island or river-bed formation, or accretion thereto, or whether such land always was an integral, distinguishable and discernible part of defendants' deeded lands, although at times subject to submersion and overflow of the river, or accretion to defendants' deeded lands. The evidence respecting this issue is voluminous and sharply conflicting, and the evidence on each side of the issue is, to say the least, somewhat contradictory. To undertake to set out in detail the evidence would serve no useful purpose. We have carefully read and endeavored to analyze the great mass of evidence contained in a voluminous record, and we have reached the conclusion, after a close and laborious study and consideration of the same, that there is substantial evidence on each side of the issue. However, a statement of some of the facts which the evidence tended to show is necessary to an understanding of the case.

A survey or plat of Township 63, Range 41 west of the 5th principal meridian, was made by the Federal Government in 1839, and offered in evidence by defendants. The Government survey shows the Missouri River, as then located, as flowing in a southeasterly direction adjacent to and west of fractional Section 23, which lies immediately west of Section 24. The land in controversy is in the northwest quarter of Section 24. The Government survey of 1839 shows Section 24 as being a full Section of 640 acres, and shows fractional Section 23, which then lay between Section 24 and the Missouri River as then located, as containing 236.67 acres. The boundary line between Holt and Atchison counties is coincident with the north line of Sections 23 and 24, Township 63, Range 41, Atchison County being on the north, and Holt County on the south, of the boundary line. The land in controversy, as hereinabove stated, is in the northwest quarter of Section 24, Township 63, Range 41, and embraces all of said quarter section, except a small triangular tract of land in the northeast corner of said quarter section of about one acre in area, to which small triangular tract plaintiff apparently concedes in his brief, and conceded on the trial, he makes no claim to possession. This small triangular tract of approximately one acre is bounded on the north by the north line of Section 24, or the boundary line between Atchison and Holt counties, and on the east by the north-and-south center line of Section 24, and the hypotenuse of the triangle, extending from the northwest to the southeast, is variously denominated by the witnesses as the "high bank," "left high erosion bank," "east bank," "old original bank," and "old erosion bank" of the Missouri River. But by whatever name it is called by the witnesses, the evidence tends to show that it marks the location of the extreme easterly shore line or bank to which the Missouri River had extended, or cut in, since the Government survey of 1839. Upon this small triangular tract or corner of land, lying northeasterly of the so-called "old high

erosion bank" of the Missouri River, was builded a house, which stood thereon for many years, and which was partially destroyed by a cyclone in June, 1896, and was thereafter rebuilt, and hence the triangular corner of land is spoken of by most of the witnesses as the "cyclone corner," the house thereon as the "cyclone house," and Section 24 as the "cyclone section." According to the testimony of many of the witnesses, the "old high bank" of the Missouri River, which separates or divides the land in controversy from the small triangular corner, is to-day quite distinguishable, or was at the time of the trial of this cause. The evidence tends to show that there is a noticeable depression along the river or westerly side of the "old high bank"; that there was a slough adjacent to the "high bank" for some years; and, at some places along the slough, there is still standing water. One of defendants' witnesses, Ben Hurst, a surveyor, testified: "I don't find any definite condition of a slough until we get down here to the northeast corner of the northwest quarter of Section 24, and you see the beginning there of a well-defined slough that gets broader and deeper as you go down this high bank line."

At the time of the Government survey in 1839, the Government plat shows that a stream known as Nishnabotna River, generally referred to by the witnesses as the Nishna River, emptied into the Missouri River in Atchison County at a point about a mile north and two miles west of the northwest quarter of Section 24. The evidence tends to show that, for some years prior to 1881, the east or left bank of the Missouri River was a half or three-fourths of a mile west of the "cyclone house," and that, in 1875, the Missouri River commenced to cut eastwardly.

Defendants' witness Scheeley testified: "Q. What was the course of the river, then, after you first knew it, from '70 until 1881? A. The action of it? Q. Yes. A. In the early '70s, it didn't do much. Along in, we will say, from '75 on down, it began to start cutting up above, and worked gradually on down—down into the '80s. Then from '81 until '83, it took all of that, and from the way it is now— the old original bank—and from that time on, the river didn't flow along there any more. Q. You say in the late '70s it cut above here? A. Yes. Q. About how far up above this land in Section 24? A. It is up above where the old Nishna come in there, but not much above—from the Nishna on east. Q. About when was it, it began cutting up there? A. I can't tell just exactly. It must have been along in '78—'77 or '78. Q. Then after that, where did it cut? A. It kept on cutting then, so much every year, until '81, then it took a big course, and cut quite a tract, and finished it up in the spring of '83. Q. Finished cutting back? A. To that old line. Q. At that time where was the river running? A. Oh, well, it was right along the bank then yet."

Plaintiff's witness Bradley testified on cross-examination: "Q. You knew this land in '81? A. Yes. Q. How long before 1881 do you remember it? A. I don't recollect anything before '81—no. Q. Do you remember the flood of '81? A. Yes. Q. And at that time the river was running right next to the high bank all the way around? A. Yes, she cut right around in there. Q. How is that? A. It cut around in there in '81. Q. Cut clear around in '81, then when the high water went down, what shape was things in there then? A. It just kept running there for quite a spell."

Plaintiff's witness James Hurst testified on cross-examination: "Q. Now you say—can you tell me, Mr. Hurst, the year that you remember that the river was running along next to this high bank— about what year it was? A. When it broke through? Q. No, when the river was cutting back in, and cut back to the high bank? A. Why, I can't exactly remember, but it cut several thousand acres off down in there from Henme's Landing up there." Henme's Landing is located by the evidence as being southwest of the town of Corning, which town is located by the evidence as being a mile south of the Atchison-Holt county line and one-half mile east of the "old erosion bank."

Plaintiff's evidence tended to show that, about the year 1881, a sand bar or island formed in the bed or channel of the Missouri River, and on the Missouri side of the main river channel; that the island gradually grew larger, so that it extended from a point about a half-mile south of the mouth of the Nishnabotna River in a southeasterly direction for a distance of two or two and one-half miles, the lower end or southerly point of the island being located by some of the witnesses as being a little to the northwest of Corning, and by other witnesses as being slightly southwest of Corning; that the main or larger channel of the Missouri River then ran on the westerly side of the island, and another and smaller channel of the Missouri River ran on the easterly side of the island for several years, thereby separating the island from the "east high erosion bank" or east shore line of the river; that the waters of the easterly channel of the Missouri River flowed with a perceptible current between the island and the "east high erosion bank" until 1891, 1892, or 1893, and one or two witnesses fixed the date as late as 1897; that thereafter the easterly channel of the Missouri River gradually filled with mud and sediment brought down from the hills and uplands by the Nishnabotna River and by two creeks, known as Rock and Mill creeks, and the sediment was discharged by those streams into the waters of the easterly channel of the Missouri River; that the sediment thus discharged into the waters of the easterly channel of the Missouri River was deposited against the northerly and easterly sides of the island; and that the island formation gradually grew larger and extended toward the east until it completely filled the easterly channel, and

eventually became joined to the "old high erosion bank," the waters in the easterly channel of the Missouri River gradually receding as the island enlarged, leaving a slough or depression along and adjacent to the "high erosion bank."

Respecting the formation of the island and the gradual filling of the easterly channel of the Missouri River, plaintiff's witness Lahue testified: "Q. Are you familiar with this land along next to the high bank? In order to identify it, do you know where the cyclone house is? A. Yes. Q. Up on the point of the land that is still the high bank? A. Yes. Q. Are you acquainted with the land that is out from that? A. Somewhat, yes. Q. Do you recall how that land was formed? A. Yes, sir. Q. How was it formed? A. Well, it formed an island, or we call them sand bars. Q. After it formed as an island, what water was between it and the high bank? A. Oh, there was a stream of the Missouri River, probably 50 to 75 yards wide, run the Missouri bank. Q. How long did that run there, Mr. Lahue? I don't mean definitely, but for a long time, or a short time? A. Well, it run there—began to fill, I guess, in the latter '80s, or early '90s. Q. Began to fill in the early '90s? A. Yes, began to fill that up. Q. Where did it fill first, if you know? A. Well, it began to fill at the west end of this incoming stream. Q. What filled it? Could you tell? A. It was the incoming stream—what we called Mill Creek—brought sediment from the upland, and filled the Missouri River stream up. . . . It naturally filled from this bar until it got (to) the original bank. Q. The current ran against the bank, and deposited against the bank, didn't it? A. Well, this stream here done the filling. Q. Well, I know, but it deposited— the deposit was against the bank, wasn't it? A. Well, no; there is a depression on that bank yet to-day, and the lower end is standing water. Q. At the lower part, you say, is still some water standing? A. Yes. Q. Some stagnant pools along there? A. Well, pretty good lake last summer."

Witness Luken testified for plaintiff: "There was quite a stream of water along the bank, and there was an island. Of course, it was quite wide when I first remember, but it got smaller, you know. It seemed like it shut up at the time they cut that Rock Creek through the bar. I don't remember just what year that was. And it seemed from that time on, it kind of filled up. It just gradually filled up, and left kind of a slough there along the main bank. . . . Q. Well, state how it formed? A. Well, it was—as I say, it was an island at one time. It was an island, and this water left. Of course, it left this land there—this island—and then it gradually filled up toward the bank. Q. What was it that gradually filled up toward the bank? A. Well, that formation kept getting larger out there, and filling toward the main bank—the old bank. Q. Did this island you spoke of include this quarter section—this northwest of 24?

A. Yes, sir. It run all the way down to southwest of Corning. Q. So the court—A. (Interrupting) There was one on the Nebraska side, and one what we call the Missouri side. The two waters met right southwest of Corning, over in there. . . . Q. During this time, you say, there were two streams—one south of this island, and the other north of it, or one east of it, and one west of it. Did you have any experience of any kind crossing this Missouri side, as you call it? A. Well, no. Q. Did you cross it? A. I didn't cross it myself. There was only one way to get over there, and that was with a boat." . . . Cross-examination: "Q. Was an island there in 1897? A. Certainly. Q. There was? A. Yes. Q. And in 1897, the river was running between the island and the Missouri shore? A. Yes. Q. That was in 1897? A. As near as I can remember; yes, sir. Q. And you say the water was running there all the time, at that time? A. Yes, sir. Q. Whether it was high or low? A. Yes. Q. Then how long was it after that time before it was filled up? A. Well, I don't remember that. As near as I can recollect, when they cut that Rock Creek there—I don't remember what year they did that. Q. When Rock Creek was cut through, did the water stop running then down next to the high bank? A. Yes, sir. It didn't run through there all the time. Q. In 1897 how close was the channel of the Missouri River running to this high bank? A. Right up against it."

Witness Benedict testified on behalf of plaintiff: "Q. When did you first become acquainted with this land out here—this land in controversy? A. Well, the first—when I first knew it, there wasn't no land there. It was the river. Q. Well, when did you first know the land? When did you first see the land? A. Well, it was a bar in there—part of it, and then it run on down farther—the bar did—through the river. Q. Did you ever hunt and fish on that bar any? A. Yes. Q. When did you first begin hunting and fishing on that bar? A. Well, it must have been about thirty years ago. Q. Well, when you began fishing on that bar, where was the water with reference to it? A. Well, there was water on both sides of it. Q. Where was the Missouri River? Was the Missouri River on both sides of it, or one part? A. Part of it was on one side, and part on the other. Q. How much of the Missouri River was on the west side of it, and how much on the east side? A. There was probably a hundred or a hundred and fifty yards on the east side, and on the west side there was more. The biggest part of the water was on the west side. Q. The biggest part of the water, when you first saw it, was on the west side. Well, did the island get bigger or smaller? A. Well, it got bigger, because it began to fill that channel up in there."

Other witnesses on behalf of plaintiff testified to the existence of the island and of the channel of the Missouri River on the easterly side of

the island; that the waters of the channel flowed with a perceptible current between the island and the east shore line of the Missouri River, and extended to the "high erosion bank" on the Missouri side of the channel; that the easterly channel gradually filled with sediment which was discharged into the waters of the channel by its tributary streams and was deposited against the island, and that the waters of the easterly channel gradually receded into the main or westerly channel of the Missouri River, as the island enlarged. The testimony of plaintiff's witnesses as to the existence of an island in the vicinity of the land in controversy is corroborated to some extent, at least, by defendants' witness Fred Scheeley, who testified on direct examination: "Q. What do you know about any island out there in the river, Mr. Scheeley? A. Well, there was an island, at one time, right straight west of Corning. Q. How far out was that? A. Well, just across the width of that channel. I don't know how far. Sometimes it was wide, and sometimes it wasn't. Q. How far was that from this land? A. The north end of the island wouldn't be very far from that land. Q. How far up did that island extend up toward—up this way (indicating)? A. The island run pretty near straight north and south. Q. West of Corning? A. Yes. Q. Was there ever any island west of this land in Section 24? A. That is the only island I ever had anything to do with—the one west of Corning. We used to go over there hunting and fishing, and one thing and another. Q. Did it ever embrace any of this land? A. How? Q. Was any of this land ever on that island? A. No, sir; I think not. Q. How long did the Nishnabotna River run down near the bluff there? A. Well, that is not any way near the bluff. Q. It never did come near the bluff? A. No, sir." Cross-examination: "Q. You say there was an island west of Corning? A. Yes. Q. How long an island was it? A. That was quite a little tract of land—probably a mile—I don't know just how long, but I suppose it was somewhere near that. Q. Good big island? A. Yes. Q. What became of it? A. Disappeared. Q. How long did it stay there? A. It was there for several years—I don't know how many. Q. When did it come there? A. The first showing was after '81. Q. The first showing was after '81? A. Yes."

On March 7, 1917, the County Court of Holt County made and entered of record an order to the effect that it appeared to the court that "there are certain made lands in Holt County embraced within the original survey of Sections 22, 23, 24 and 25, Township 63, Range 41, and Sections 19, 30, 63 and 40, and that said made lands are, by reason of the manner of their formation, the property of Holt County," and the county surveyor was ordered to make a survey and plat of said lands. The survey was made by the county surveyor in obedience to the order of the county court and the plat was filed with the county clerk on August 8, 1917. The lands included

in said survey and plat were offered to purchasers at private sale by the County Court of Holt County under authority of the provisions of an act of the General Assembly approved on April 8, 1895, entitled, "An act to grant certain lake and river bed lands to the counties in which they are located for school purposes." [Laws 1895, page 207; R. S. 1919, secs. 7029-7032.] On October 3, 1922, a patent was issued by order of the County Court of Holt County, conveying to plaintiff the land in controversy, as described in the petition and judgment herein, for a consideration of $1.60 per acre, payment of which consideration is acknowledged in the patent. The patent was filed for record and recorded in the office of the Recorder of Deeds of Holt County on October 18, 1922.

The claim of title of defendant Bleish to the land in controversy, and his right to possession of said land, is based upon a warranty deed from Joseph M. Zmek and wife, dated January 18, 1917, and recorded on February 1, 1917, conveying to defendant Bleish "all of the northwest quarter of Section 24, Township 63, north, Range 41, west, containing approximately 158.88 acres, as same is marked and designated on the recorded plat thereof," for a consideration of $5,000 expressed in the deed, and upon an unbroken chain of title originating with a patent to said quarter section from the State of Missouri to John Pixler, dated July 18, 1848, and mesne conveyances of said quarter section, beginning with a deed from Pixler, the original patentee, dated September 28, 1852, and ending with a deed to Joseph M. Zmek, the immediate grantor of defendant Bleish, dated May 8, 1914. There is some evidence in the record of possession of the premises in controversy by defendant's predecessors in title, but it does not appear from the evidence that there has been continuous, uninterrupted and unbroken possession of said premises prior to January 18, 1917, the date of the deed from Zmek to defendant Bleish. The evidence of defendant Bleish tends to show that he, or his tenant, has been in continuous possession of the premises since the date and recording of the Zmek deed. Other facts and circumstances, if necessary, will be noticed in the course of the opinion.

I. It is urged by defendants that the judgment is not supported by the evidence, and, furthermore, that plaintiff's evidence does not show beyond dispute that the land in the northwest quarter of Section 24 and in fractional Section 23, shown as existing in the Government survey of 1839, was entirely washed or cut away by the Missouri River, and that thereafter an island was built or formed in the bed of the Missouri River, and that the land in controversy was a part of such island, or accretion thereto. Defendants argue that the testimony of plaintiff's witnesses is unworthy of credence and of no probative force or effect. The present action, however, is one in ejectment, and there-

fore is clearly an action at law, and the main issue tried below was wholly an issue of fact, viz., whether the land in controversy is land of island or river-bed formation and accretion thereto, or otherwise. An examination and analysis of the pleadings discloses, we think, that no equitable issue or defense was tendered by defendants sufficient to convert the action into one in equity, or to make the issue of fact aforesaid exclusively triable by a chancellor. The record indicates that the parties deemed the action, and the issue of fact arising therein, to be triable by a jury, for the record recites the waiver of a jury by agreement of the parties. While the testimony was sharply conflicting and somewhat contradictory, yet we are unable to say, as a matter of law, that there was no substantial evidence to support the claim and theory of plaintiff. On the other hand, a close consideration and analysis of the evidence leads us to the conclusion that there was substantial evidence to support the general finding and judgment of the trial court. The action was tried by the court, sitting as a jury, without declarations of law asked or given, and without a request for written findings of fact, and the general finding and judgment of the trial court being supported by substantial evidence, such finding and judgment is conclusive upon this court, unless reversible error in the admission or rejection of evidence, or other procedural error, shall appear to have been committed by the trial court. [Dumm v. Cole County, 315 Mo. 568; Anderson v. Sutton, 295 Mo. 195; Case v. Sipes, 280 Mo. 110; Moore v. Farmer, 156 Mo. 33; Cullen v. Atchison County (Mo. Sup.), 268 S. W. 93.] Where the evidence is conflicting, the trial court, sitting as a jury, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony; and it is not for this court to pass upon the weight of the evidence and thereby usurp the functions and prerogative of the constituted trier of the facts. [Lee v. Conran, 213 Mo. 415; Brecker v. Fillingham, 209 Mo. 583.] Most of the witnesses herein testified with the aid of a plat or survey of the land in controversy, and, in testifying, pointed out upon the plat certain locations and landmarks which, no doubt, were familiar to them. Much of such testimony, as presented in the printed record for our review, is well nigh unintelligible. The trial judge had the witnesses and the plat used by them in testifying within his view, and consequently such testimony was doubtless made clear and intelligible to him. Therefore, even though the present cause might be viewed as one of undoubted equitable cognizance (which we think it is not), nevertheless, because of the nature of the testimony and the manner of its elicitation, we would be disposed to defer somewhat to the findings and conclusion of the trial judge because of his better opportunity to comprehend and understand the testimony and the force and effect to be given thereto, and because of his better opportunity to view the demeanor of the witnesses, and their manual signs and

references to the plat used in their examination, and to judge of the weight and credibility to be given to their testimony.

It is plain that the trial court, in finding the issues for plaintiff, thereby found the fact to be that the land in controversy was not a part of the original land embraced in the Government survey of 1839, or accretion to such land, but that all that part of the northwest quarter of Section 24 lying southwesterly or westerly of the high erosion bank and of the small triangular tract or corner of land in the northeast corner of said quarter section, was wholly and completely washed or cut away by the Missouri River, and that the land in controversy was remade in the bed or channel of the Missouri River and took form as an island which sprang up in the river bed and which gradually enlarged, by reason of accretion or recession, so as eventually to become joined to the east high erosion bank of the river. Such being the fact as found by the trial court, defendants have no legal title to the land in controversy, although included within the lines of the original survey of the northwest quarter of Section 24, under the principles of law in this State respecting navigable waters and accretions, as established and declared by the decisions of this court. [Cooley v. Golden, 117 Mo. 33; Naylor v. Cox, 114 Mo. 232; Cox v. Arnold, 129 Mo. 337; Perkins v. Adams, 132 Mo. 131; Hahn v. Dawson, 134 Mo. 581; Moore v. Farmer, 156 Mo. 33; McBaine v. Johnson, 155 Mo. 191; DeLassus v. Faherty, 164 Mo. 361; Widdecombe v. Chiles, 173 Mo. 195; Chinn v. Naylor, 182 Mo. 583; Frank v. Goddin, 193 Mo. 390; Dumm v. Cole County, 315 Mo. 568.]

II. It is claimed by defendants that, if the land in controversy is of river-bed or island formation, or accretion thereto, as found by the trial court, the United States has never ceded or granted such such land to the State of Missouri, and the State, as sovereign, has never acquired titled thereto, and the title remains in the United States; wherefore, it is asserted that no title passed from the State to Holt County by virtue of the act of the General Assembly, approved April 8, 1895, and acts amendatory thereof, now Section 7029, Revised Statutes 1919, which reads: "All lands belonging to the state, not otherwise appropriated under the laws thereof, which have been formed by the recession and abandonment of their waters of the old beds of lakes and rivers in this State, or by the formation of islands in the navigable waters of the State, are hereby granted and transferred to the respective counties in which such lands are located, to be held by such counties for school purposes." Hence, it is urged that plaintiff has no title by virtue of the patent from Holt County, and he cannot maintain the present action in ejectment for possession of the land in controversy, under the familiar rule that plaintiff must recover on the strength of his

own title, and not by virtue of the weakness or want of title of the defendant, who is in possession. [Creech v. Childers, 156 Mo. 343.]

The defendants ground the foregoing contention upon an early decision of this court in Adams v. St. Louis, 32 Mo. 25, 26, wherein it appears to have been held, in substance and effect, that the State, by virtue of its sovereignty, did not acquire title to an island that has formed in the Mississippi River since the State was admitted into the Union. A similar announcement seems to have been made in Benson v. Morrow, 61 Mo. 345. Adverting to those two decisions, Mr. Gould, in his treatise on the Law of Waters (3 Ed.), says in a footnote found on page 328 of that text: "In Missouri, unnamed and unsurveyed islands in the Mississippi River were at first held to belong to the United States and not to the State. [Adams v. St. Louis, 32 Mo. 25; Benson v. Morrow, 61 Mo. 345.] This seems, however, contrary to the current of authority. [Pollard v. Hagan, 3 How. 212; Martin v. Waddell, 16 Peters, 367; Barney v. Keokuk, 94 U. S. 324.]" The same author, in Section 166 of the said text, states the following as the generally accepted rule: "When islands are formed by either the sudden or gradual action of tide waters within the territory of the nation, they belong to the Crown at common law, and in this country to the respective States. The same is true of the navigable fresh waters of this country belonging to the State, except that, when shoals, sandbars, or islands form along the margin of the water, it is a question of fact for the jury whether they are the property of the State or of the riparian owners as accretions."

In 29 Cyc. 355, it is said: "No title to the soil under navigable waters was conferred by the Constitution upon the Federal Government, so far as the original States were concerned, but the title remained in the respective States. But before a State is admitted and while it is a territory, the Federal Government is vested with the title to the lands under water. This title, however, except as conveyed before the admission of the State, is relinquished to the State upon its admission into the Union."

The rule or doctrine just stated finds ample support in the decisions of the Federal Supreme Court in Pollard's Lessee v. Hagan, 3 How. 212; Barney v. Keokuk, 94 U. S. 324; and Mobile Transportation Co. v. Mobile, 187 U. S. 479.

In Gould on the Law of Waters (3 Ed.), section 39, page 94, it is said: "The United States is the source of title to lands within its limits which are not within the boundaries of the States, and the new States, being admitted into the Union upon an equal footing with the original States, become entitled to all the rights and privileges possessed by the latter. They have the same rights, sovereignty, and jurisdiction, as to the soil of navigable waters, as the older States; and neither the right of the United States to the public lands, nor the power conferred upon Congress to make laws and regulations for the

sale and disposition thereof, enables the General Government to grant the shores and bed of such waters within the limits of a new State after its admission into the Union."

The later decisions of this court appear no longer to follow the doctrine which seems to have been announced in the earlier cases of Adams v. St. Louis, and Benson v. Morrow, supra, but appear to hold to the rule or doctrine announced by the Federal Supreme Court in the cases cited supra, namely, that title to the bed or soil under the navigable waters within the boundaries of the State passed from the United States to the State of Missouri upon its admission into the Union, and when islands spring up or form upon the soil or river bed beneath the waters of navigable rivers within the boundaries of the State, or lands are made by the recession of the waters of such navigable rivers, such lands are part of the public domain, and the State, by right of sovereignty, has the power and authority to transfer and grant its title thereto to the respective counties of the State in which such lands are located, to be held by such counties for school purposes, under the Act of the General Assembly of 1895. [McBaine v. Johnson, 155 Mo. 202; Moore v. Farmer, 156 Mo. 49; State ex rel. v. Longfellow, 169 Mo. 129; Frank v. Goddin, 193 Mo. 395.]

While it is true that the Missouri River did not constitute the original western boundary of the State of Missouri upon its admission into the Union in 1820 (Federal Act of Admission, sec. 2, p. 62, R. S. 1919), nevertheless, by the Act of Congress of June 7, 1836 (U. S. Stat. at Large, 34) and the subsequent purchase and extinguishment of the Indian title by treaty with the Indians made on September 17, 1836, and the taking effect of such act by proclamation of the President of the United States on March 28, 1837 (which several steps are historically known as the "Platte Purchase"), the sovereign jurisdiction over the lands lying between the original western boundary of Missouri (as located by the Act of Admission of 1820) and the Missouri River was ceded by the Federal Government to the State of Missouri, and the western boundary of the State was thereby extended to the Missouri River, which boundary has been judicially construed and determined to be the middle of the main channel of the Missouri River, and not the easterly bank of that river. [Missouri v. Kansas, 213 U. S. 78; Missouri v. Nebraska, 196 U. S. 23; Cooley v. Golden, 52 Mo. App. 229.] The sovereign jurisdiction over the territory acquired under the "Platte Purchase," together with the ownership of, and title to, the bed or soil beneath the Missouri River, a navigable stream, lying east of the middle of the main channel of said river, and within such acquired territory, was, in our opinion, none the less relinquished by the United States to the State of Missouri as if such territory had been included within the original boundaries of the State at the time of its admission into the Union in 1820. That such conclusion is well grounded

seems apparent from the decision of the United States Supreme Court in the case of Missouri v. Kansas, 213 U. S. 78, supra, wherein the sole question ruled and determined was whether an island in the Missouri River *belonged* to the State of Kansas, or whether it *belonged* to the State of Missouri. It appearing herein that the land in controversy was made or formed as an island by accretion or recession (as found by the trial court) upon the soil and bed of the Missouri River, which is a navigable river, and it also appearing that said land lies entirely east of the middle of the main channel of said river, or the western boundary of this State as fixed by the acts of Congress and judicially determined by the Federal Supreme Court, we therefore have reached the conclusion that title and ownership to such made or river-bed land was relinquished by the United States and passed to the State of Missouri, as sovereign, and, by virtue of its right of sovereignty, the State of Missouri had the power and authority to transfer and grant its ownership and title therein to Holt County under the Act of 1895 aforesaid.

III. Defendants assert that reversible error was committed by the trial court in the admission and rejection of evidence. A witness on behalf of plaintiff was asked whether timber had been sawed by the defendants from the land in controversy. After witness had answered the question in the affirmative, defendants then interposed an objection thereto. The objection having been interposed after the answer had been made by the witness, and no motion having been made by defendants to strike out the answer, the trial court should not be convicted of reversible error in overruling the untimely objection made to the form, competency and relevancy of the question. [Boyd v. Kansas City, 291 Mo. 647.] Furthermore, it does not appear that the question and answer were harmful or prejudicial to defendants as bearing upon the main issue on trial, even though the question and answer may be viewed as being immaterial to that issue.

Defendants' witness Ben Hurst, a surveyor and drainage engineer, was asked by defendants' counsel to state the difference, by comparison, between certain supposedly island or accretion formations he had observed opposite the Iowa shore of the Missouri River and the land in controversy, evidently for the purpose of drawing an opinion from the witness that the land in controversy was not of island or accretion formation. Plaintiff objected to such examination for the reasons that the subject of inquiry did not call for opinion evidence, that the method of examination invaded the province of the court as the trier of the ultimate fact, and that the witness was not qualified to express an opinion respecting the manner of formation of the land in controversy, witness not having seen such land until long after its formation. Wit-

ness testified that he had never seen the land in controversy until about seven years before the trial. Other witnesses testified that they had actually seen such land in process of formation many years before the trial. The subject of inquiry (i. e., whether the land in controversy is of island formation), we think, cannot be said to be so indefinite and uncertain in its nature as not to be susceptible of direct proof, or to be so incapable of direct proof as to render admissible the mere opinion of a witness who had not seen the land until recently and long after its formation. But be that as it may, it appears from the record that, later in the examination of the witness, the trial court allowed defendants considerable latitude in the examination of the witness respecting certain soil differences observed by him between the land in controversy and other river-bed lands. It is not apparent to us that defendants were harmed by the rejection of the particular testimony offered, inasmuch as it appears that the trial court subsequently admitted, and had the benefit of, the witness's testimony respecting various soil differences observed by him between the land in controversy and other Missouri River bottom lands. We find no reversible error in the admission or rejection of evidence during the progress of the trial, and the point must be ruled against defendants.

IV. We see no place herein for the application of the several statutes of limitation pleaded by defendants in bar of the instant action. If the land in controversy was formed as an island upon the bed of the Missouri River about the year 1881, and was gradually enlarged by accretion or recession, as the trial court found the facts to be, the title and ownership thereof was in the State of Missouri, as we have herein ruled, until the State granted and transferred its ownership and title to Holt County under the Act of 1895 aforesaid. Prior to the grant, under the Act of April 8, 1895, from the State to Holt County, the several statutes of limitation did not run against the State. [Sec. 1314, R. S. 1919; Hamilton v. Badgett, 293 Mo. 324, 332.] The Act of April 8, 1895, aforesaid, in Section 3 thereof (Laws 1895, p. 207), provides: "No statute of limitations shall begin to run against the counties in which any such lands are situated to prevent them from recovering or acquiring such lands, for twenty years after the passage of this act; but after that date such counties, as to such lands, shall be subject to the same limitation laws as private individuals." The patent under which plaintiff claims was issued by Holt County in 1917, and the instant action was commenced in 1923, within ten years after the year 1915, the time fixed by the Act of 1895 for the statutes of limitations to start to run against the county. Besides, a close study of the record herein fails to disclose any substantial evidence of actual, adverse, continuous and uninterrupted possession of the land in question by

defendants' several purported predecessors of title. While there is some slight evidence of desultory possession at different times prior to January 18, 1917, the date of the Zmek deed to defendant Bleish, yet there is no evidence that such possession was continuous, uninterrupted and unbroken, or that such possession was held under claim of ownership or title.

V. Defendants urge the doctrine of laches in bar of plaintiff's action, because of the failure of Holt County to assert a claim of title and ownership to the land in question earlier than the year 1917. But, as we have said herein, plaintiff's action is an action at law, wherein plaintiff grounds his right of action upon a legal title. Laches is peculiarly a defense to an equitable claim or cause of action, and has no place as a defense to an action at law, or to an action wherein plaintiff stands upon a legal claim of title. [Kellogg v. Moore, 271 Mo. 189; Brooks v. Roberts, 281 Mo. 551; Willis v. Robinson, 291 Mo. 650.] Furthermore, we do not find that laches (using that term in its proper sense and accurate meaning) is pleaded in the answer of defendant Bleish. Laches, in order to be available as a defense to an equitable claim or cause of action, must be pleaded. [Turner v. Edmonston, 210 Mo. 411; Kellogg v. Moore, 271 Mo. 189; Coleman v. Insurance Co., 273 Mo. 620.]

VI. Defendants urge that plaintiff's patentor and grantor, Holt County, was estopped, and that consequently plaintiff is likewise estopped, to claim the land in controversy by reason of the fact that the officers of Holt County had assessed the land for taxation, and collected taxes levied thereon from defendant, and those under whom he claims title, for a number of years prior to the issuance, by Holt County, of the patent to plaintiff. In Hooke v. Chitwood, 127 Mo. l. c. 376, we said, in ruling a like contention: "The lands belonging to the county could only be sold and conveyed in the manner pointed out by the statute. For the purpose of managing and selling swamp land the county court is not the general agent of the county. The statutes constitute the warrant of authority. [Sturgeon v. Hampton, 88 Mo. 213.] Much less could the county be estopped to assert title by the fact that the county court had levied, and the collector had collected, taxes upon the lands over which the court is given control." And in the later case of Senter v. Lumber Co., 255 Mo. l. c. 607, we again said: "But we do not agree to the proposition that the mere assessment of land by county officers, and the collection of taxes levied under such assessments, by other county officers, will estop a county from asserting title to land, to which it has either the legal or equitable title."

It is also claimed that Holt County was estopped because of its nonaction to claim the land in controversy prior to January 18, 1917,

the date of the deed from Zmek to defendant Bleish, and in permitting defendants to place improvements on the premises thereafter. Estoppels against the public are little favored, and mere acquiescence, laches, lapse of time, or nonaction on the part of the public, or the public agents or officers, does not ordinarily work an estoppel. [21 C. J. 1188.] In Steckel v. Vancil, 92 Kan. 591, plaintiff sued in ejectment for possession of an island in a navigable stream, claiming the island to be an accretion to his shore lands. Defendant had acquired title to the island from the State of Kansas by purchase, under a legislative act vesting title to all islands lying in the navigable streams in the State, and authorizing the State to sell such islands according to the procedure for the sale of state school lands. Plaintiff contended in that case that the State, by acquiescing for a long period of time in the occupancy and use of the land by individuals, was estopped to claim title, and could pass no better right to defendant. It was there held that the State was not estopped to assert title because of its acquiescence and nonaction. Furthermore, the testimony of the County Surveyor of Holt County in the instant action tends to show that there were no improvements on the land in controversy at the time the land was surveyed by him under order of the county court in 1917, and the evidence tends to show that whatever improvements were put on the land by defendants were put thereon after defendants had notice that the county was laying claim to the land. We see no reason for the application of the doctrine of equitable estoppel herein.

VII. Defendant Bleish claims that the County Court of Holt County should have given him the preferential right to purchase the land in controversy from the county, and that the denial to him of such preferential right or opportunity to purchase the land in controversy amounted to a legal fraud upon the part of Holt County. Section 2 of the Act of 1895 (Sec. 7030, R. S. 1919) authorizes the respective counties to sell and convey the island lands granted to such counties by the State in the same manner that the swamp lands acquired under Act of Congress of September 28, 1850, are conveyed. The method or procedure for the sale of swamp lands is prescribed in Section 6994, Revised Statutes 1919. That section provides that such lands may be sold at public sale to the highest bidder, and it is further provided therein "that the county courts of the several counties in this State may, if in their judgment it is deemed advisable, sell any of the swamp or overflowed lands in their counties at private sale, without advertisement as provided in this section, at a price not less than one dollar and twenty-five cents per acre." The statutes aforesaid provide for and afford no preferential right to purchase such lands. While it might have been more generous and fair to defendant for the

174

county court to have given him the preferential right to purchase the land in controversy, yet the statute under which the sale was made by the county court affords defendant no such right as a matter of law; in other words, the statute gives to defendant no legal ground upon which to claim a preferential right or opportunity to purchase the land. However ungenerous may have been the action of the county court toward defendant in denying to him a preferential right to purchase the land, we do not see wherein the action of the county court affects the validity of the patent delivered to plaintiff as the bona-fide purchaser of the land, and under which patent he claims title and the right to possession of the land. The land was sold to plaintiff at private sale in full compliance with the provisions of the statute and for a consideration in excess of that required by the statute. There is no showing in the record that plaintiff, in any manner, colluded or conspired with the county court to exclude defendant as a purchaser, and plaintiff having purchased the land in good faith, so far as the record shows, and having paid the consideration demanded by the county court, and having received from the county for such consideration a patent in due form and regular upon its face, we do not think that the patent, or plaintiff's claim of title and right to possession thereunder, can be attacked in the present action because of any ungenerous or unfair action of the county court toward defendant, and of which action of the county court defendant is afforded no legal right to complain.

VIII. The record herein shows that the trial was concluded and the cause was submitted to the court on November 2, 1923, and taken under advisement by the court. On March 5, 1924, the date on which the court entered judgment herein, defendants filed a motion to reopen the case and to offer newly-discovered evidence. In support of the motion, defendants filed an *ex parte* affidavit which tended only to contradict the testimony of one of plaintiff's witnesses, and also filed three *ex parte* depositions of witnesses taken by defendants several weeks after the cause had been submitted and taken under advisement by the court. The trial court overruled defendants' motion to reopen the case, and defendants assign error in the ruling of the court on such motion, claiming that the trial court was guilty of an abuse of discretion therein. The newly-discovered evidence set forth in the *ex parte* affidavit and depositions filed in support of defendants' motion appears to be merely cumulative. Under the circumstances aforesaid, and in view of the fact that the motion was not filed until four months had elapsed after the submission of the cause, and until the very day upon which the court announced its finding and entered judgment, we cannot say that the trial court erred in denying defendants' motion or that the court was guilty of an abuse of discretion in such action.

[Mayor of Liberty v. Burns, 114 Mo. 426, 432; Devine v. Wells, 300 Mo. 177.]

IX. Defendants contend that the last paragraph of the judgment, wherein it is ordered, adjudged and decreed "that the plaintiff is vested with the fee-simple title to the real estate hereinabove described . . . and that the defendants, or either of them, or anyone claiming under them, have no right, claim or interest in said real estate, or any title whatsoever, either legal or equitable, in and to said real estate, or any lien thereon," is not responsive to the cause of action alleged in the petition or to the issues tendered thereby. The cause of action, as alleged and stated in plaintiff's petition, is solely one in ejectment, and the only relief prayed by plaintiff is for judgment for the recovery of possession of the described premises, together with damages for the withholding of possession and for rents and profits. The answer of defendant Bleish, in our opinion, did not convert or change plaintiff's statutory action in ejectment into an action to quiet or determine title. The action of ejectment, under our statute, is purely and solely a possessory action (Sec. 1815, R. S. 1919; Rogers v. Mayes, 84 Mo. 520; Kelpe v. Kuppertz, 235 Mo. 479), and the statute specifically prescribes the form and content of the judgment to be entered. [Sec. 1830, R. S. 1919.] It is the established rule in this State that judgments must be responsive to the issues raised by the pleadings, and that the relief to be awarded by the judgment is limited to that sought by the pleadings; furthermore, a judgment which is based upon issues not made by the pleadings is *coram non judice* and void, at least insofar as the judgment goes beyond the issues presented and raised by the pleadings. [Ross v. Ross, 81 Mo. 84; Schneider v. Patton, 175 Mo. 684; Roden v. Helm, 192 Mo. 71.] Again, it is held that a plaintiff cannot declare upon one cause of action and recover upon another and different cause of action. [Harris v. Railroad, 37 Mo. 308; Newham v. Kenton, 79 Mo. 382.] In Springfield Engine & Thresher Co. v. Donovan, 147 Mo. 622, it was held that in a plain ejectment action plaintiff, if entitled to recover, was entitled to judgment for possession or nothing, and a judgment which granted plaintiff equitable relief, although the answer of defendant pleaded an equitable defense, was not justified either by the pleadings or the law. The error in the judgment complained of by defendants herein is one which appears upon the face of the judgment, and hence appears upon the face of the record proper, and therefore such error may be raised for the first time on appeal, without the necessity of motion or exceptions in the trial court. [Barber Asphalt Paving Co. v. Field, 134 Mo. App. 663; Ryan v. Growney, 125 Mo. 474; Showles v. Freeman, 81 Mo. 540; Roden v. Helm, 192 Mo. 71, 93.] The last paragraph of the judgment, adjudicating and

determining the title to the land in controversy, for the reasons above stated, is *coram non judice* and void, and the judgment entered below must be reversed because of such error.

X. Lastly, it is contended by defendants that there is no substantial evidence to support the judgment entered below in two particulars. The same point was called to the attention of the trial court in defendants' motion for new trial, which assigns as a ground for a new trial, that "the finding and judgment of the court is against the evidence." The judgment ordered that plaintiff shall recover of defendants the sum of $100 per month as the value of the rents and profits of the described premises until plaintiff be restored to possession. Our examination of the record discloses no proof offered by plaintiff as to the value of the rents and profits of the land in controversy. Defendants' witness Whitton, on cross-examination, testified that defendant Bleish rented the quarter section of land "on shares," and that "he supposed the rental value would be about $3 an acre a year." So far as we find in the record, the statement of Whitton aforesaid is the only utterance of any witness touching upon the value of the rents and profits, and such statement cannot be considered as being any substantial evidence, in our opinion, upon which to found a judgment for more than a merely nominal sum as the value of the rents and profits. [Hahn v. Cotton, 136 Mo. 216; Franklin v. Haynes, 119 Mo. 566.] It is therefore clearly apparent that, in the absence of any substantial evidence of the value of rents and profits, as here, the judgment of the trial court upon that issue is erroneous and must be reversed for the reason that the judgment is not supported by the evidence and is, of course, against the evidence.

The judgment below orders that plaintiff be restored to the premises, which are described in the judgment as "all land of island formation in the northwest quarter of Section 24, Township 63, of Range 41, *same being the fractional northwest quarter of Section 24, Township 63, of Range 41*, containing 158.909 acres, more or less," except two strips of lands, described by metes and bounds, reserved for a public road. The above italicized clause of the judgment makes clear the contention of defendants that the judgment, in describing the premises, includes the whole of the northwest quarter of Section 24 and embraces the high land in the northeast corner thereof that lies easterly, or northeasterly, of the so-called "high erosion bank" of the Missouri River, which high land, or small triangular tract, the evidence clearly shows was never washed or cut away by the erosion of the Missouri River. There is not a scintilla of evidence in the record that the small triangular tract of land in the northeast corner of the northwest quarter of said Section 24, and lying easterly of the high erosion bank, was ever washed or

cut away by the river, or that such triangular tract of land is of island or accretion formation. The plaintiff on the trial below conceded that he was making no claim for possession of the high land in the northeast corner of said quarter section and lying easterly of the old high erosion bank of the Missouri River, and so concedes in his brief filed in this court. Yet the trial court, by its judgment, awarded to plaintiff the possession of the *whole* of the northwest quarter of Section 24, Township 63, Range 41. In so doing, the trial court entered a judgment which is not supported by the evidence and which is clearly erroneous. Plaintiff argues that, inasmuch as the judgment describes the land as being 158.909 acres, more or less, of *island formation*, the judgment cannot be held to include the triangular tract of land in the northeast corner of said quarter section. But the judgment specifically defines and describes the land of which plaintiff is to be put in possession as *"being the fractional northwest quarter of Section 24."* If the italicized definitive clause had not been contained in the judgment, the judgment would have been so indefinite and uncertain in its description of the land as to render it void for uncertainty. [Livingston County v. Morris, 71 Mo. 603; Robertson v. Drane, 100 Mo. 273; Franklin v. Haynes, 139 Mo. 311; Bricken v. Cross, 140 Mo. 166; Collins v. Andriano, 264 Mo. 475.] It is clear to our minds that the judgment entered below includes, in its description of the premises, the whole of the northwest quarter of Section 24, and, in so doing, necessarily embraces the small triangular tract of land in the northeast corner of said quarter section and lying easterly of the high erosion bank of the Missouri River, which small tract of land the evidence clearly shows was never washed away by the river, and to which small tract of land the defendant Bleish appears to have the better and superior record title. Hence, the judgment, in describing the land, awards to plaintiff the possession of more land than the uncontroverted evidence shows he is entitled to, and the judgment must be reversed upon that ground.

While the judgment below must be reversed and the cause remanded, for the reasons herein stated, nevertheless we do not think that the reversal of the judgment makes necessary a retrial of the issues, inasmuch as it clearly appears that the errors for which the judgment is reversed may be corrected by the entry of a new judgment. It is therefore ordered that the judgment of the circuit court be reversed, and the cause be remanded with directions to the circuit court to ascertain and determine, by and with the aid of a survey, or by additional and further testimony, if such be necessary, the definite location of the old high erosion bank of the Missouri River within the northwest quarter of Section 24, Township 63, Range 41, and to definitely ascertain, determine and describe the boundary lines of the lands in the northwest quarter of Section 24, Township 63, Range 41, which lie westerly of said old high

178

erosion bank, and to enter a new judgment herein that plaintiff have and recover of defendants the possession of the lands in said Section 24, aforesaid, which lie westerly of said old high erosion bank of the Missouri River, according to the boundary lines of said lands as they shall be definitely ascertained and determined by the court, together with the sum of one dollar as damages for the withholding of said lands from plaintiff and the sum of one dollar per month as the value of the rents and profits thereof, until plaintiff be restored to the possession of said lands. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.